HAROLD H. AJIROGI and TERUKO AJIROGI, Plaintiffs-Appellees, *v.* STATE OF HAWAII, Defendant-Appellant

ROBERT FURUTA, Plaintiff-Appellee, *v.* STATE OF HAWAII, Defendant-Appellant

NO. 5907

AUGUST 30, 1978

RICHARDSON, C.J., KOBAYASHI, MENOR and KIDWELL, JJ., and CIRCUIT JUDGE SODETANI in place of OGATA, J., recused.

OPINION OF THE COURT BY KIDWELL, J.

This case involves one of society's most baffling problems: that of the borderline mental patient. Plaintiffs-appellees seek to recover from the State for injuries resulting from an escapade by such an individual (hereafter referred to as T). In a bench trial, the trial court found that the State had been negligent in permitting T to escape from the State hospital for the mentally ill (hereafter the State hospital) and was liable for the injuries subsequently caused by his operation of a stolen car. The State appealed from a judgment awarding damages to appellees. We reverse.

I.

The accident in which appellees were injured occurred on September 1, 1972. At that time, T was a 23 year old single male who had been admitted to the State hospital several times for examination or treatment of mental disorders. When he was 12 he was voluntarily admitted to the State hospital for the mentally retarded (hereafter Waimano Home) after having been in five foster homes. He was discharged from Waimano Home a year later as non-retarded and was thereupon adjudged mentally ill and ordered by a district magistrate to be hospitalized in the State hospital. After about two years he was transferred to the Hawaii Youth Correctional Facility. In 1968 he was readmitted to the State hospital and shortly after his 20th birthday was given a full discharge. The clinical summary prepared at the time of the discharge notes that "his course in the hospital was indeed stormy" and that on several occasions he went AWOL and was returned by the police after burglaries had been committed, but that charges were usually dropped. He was readmitted barely two months later on physicians' certificates which recorded their

diagnoses as "psychotic, acute, undetermined type", but was discharged from the hospital a few days later as "improved".

During the period of the last mentioned admission and discharge, T was under examination pursuant to court order to determine his criminal responsibility under a charge of larceny in the first degree. A panel of three physicians reported that T had been on the date of the alleged offense (June 21, 1969) as well as on the date of the report (September 12, 1969), "acting under mental derangement rendering him incompetent to discern the nature and criminality of the act done by him". The panel also reported that T was "incompetent to understand the nature and object of the proceedings against him, to comprehend his own condition in reference to such proceedings and to assist his attorney in making a rational defense". By order filed September 25, 1969 in Cr. No. 39852, the First Circuit Court committed T to the State hospital as insane.[1] Leaves of absence other than discharge were

---

[1] HRS § 711-91 then provided:

§711-91 Examination as to sanity of person indicted for felony. Whenever a person has been indicted for a felony by a grand jury, the judge of the court in which the person is to be tried for the offense may, in his discretion, before any trial on the criminal charge, cause the person to be examined by the psychiatrist or any designated psychiatrist of the state hospital or the director of the bureau of mental hygiene and by two additional unbiased physicians who in the opinion of the judge are qualified as examiners in insanity, with a view to determine the mental condition of the person and the existence of any mental disease or defect which would affect his criminal responsibility. In every such case the person shall by the order of the court be placed in detention in the state hospital or elsewhere as the court may direct for the purpose of the examination for a period of ten days or until completion of the examination if not concluded within the ten days, and the persons so making the examination shall file with the court their written report and opinions thereon, which report shall be accessible to the court, the prosecuting attorney, and the attorney for the accused. If the court deems the report conclusive of the then present insanity or mental irresponsibility of the accused, the court may allow a nolle prosequi to be entered in the case, and in that the case shall forthwith, without other or further proceedings, adjudge the accused to be insane and commit him to the state hospital until discharged as provided by law; or the court may direct the trial of the accused to proceed and in that case the jury shall determine any issue of the then existing or alleged previous mental irresponsibility. The compensation of the physicians making the examination shall be such reasonable sums as are allowed and shall be paid by the State.
HRS § 711-91 was repealed, effective June 1, 1973, by Act 9, S.L. 1972.

authorized by the court on February 10, 1970. The hospital's files indicate that T was absent without leave on March 31, 1970 and was next heard of on the mainland, from which he was returned on December 20, 1971. He again became AWOL on December 23, 1971, fled to the mainland and was returned in police custody to Halawa jail. Apparently because of a suicide attempt, T was returned to the State hospital on March 22, 1972. He was conditionally discharged to Halawa jail on June 2, 1972 upon a finding, as recorded in the records of the State hospital, that "he does not have any psychosis".

T was indicted on July 12, 1972, in Cr. No. 44452, First Circuit Court, for robbery in the second degree and on July 17, 1972 was ordered transferred to the State hospital for a mental examination. The formal order for T's examination, appointing three physicians to conduct the examination and directing that T be placed in detention in the State hospital for the purposes of the examination, was issued on August 3, 1972. The report of the panel, dated August 29, 1972 and filed September 15, 1972, found that although T "has a definite personality disorder and also [is] of borderline mental intelligence", he was not insane or suffering from any disorder which would affect his ability to know right from wrong on the day of the alleged crime (January 25, 1972) and on the date of the report was sane, able to comprehend his own condition and to assist his attorney in making a rational defense. T's counsel renewed his motion for a mental examination, with the result that a new panel was appointed, composed of two of the former panel together with a substitute for the state-employed psychiatrist designated by the director of health.

By letter dated April 13, 1973 and filed April 24, 1973, the new panel reported a joint diagnosis of T's physical and mental condition as borderline mental retardation together with mild to moderate diffuse and chronic cerebral dysfunction. Two of the panel added a diagnosis of malingering and disorder of impulse control. One of the panel added his diagnosis of possible Ganser's syndrome in an emotionally unstable personality. The panel agreed that T did not lack the capacity to understand the proceedings against him and to assist in his own defense, and that he did not lack substantial

capacity to appreciate the wrongfulness of his conduct, but that he did lack substantial capacity to conform his conduct to the requirements of the law. The panel reported that T presented a "mild to moderate" risk of danger to himself or to the person or property of others, "chiefly as a result of his inability to control situations that he himself may initiate". The dispositions of T which the panel suggested as tenable were prison confinement with consideration being given to the prison hospital and outpatient treatment at a mental health center. Return to the State hospital was not suggested by the panel.

On June 1, 1973, a stipulation was filed in Cr. No. 44452, signed personally by T as well as by T's counsel and by counsel for the State, in which it was agreed that T lacked substantial capacity to conform his conduct to the requirements of the law and that, due to his mental disability, T constituted a threat to person and property. By the stipulation it was further agreed that T be confined in an appropriate rehabilitation institution. On June 18, 1973, a judgment of acquittal was entered in Cr. No. 44452, and T was ordered placed in the State hospital, with release or transfer forbidden except upon order of the court.

The critical date in this narrative is August 29, 1972. On that date, T was residing in a part of the State hospital designed for the keeping of patients in detention, although he was permitted to leave his room under the surveillance of a designated attendant. Due to the negligence of this attendant, as found by the trial court, T was allowed to go unescorted and out of the direct line of the attendant's sight to dispose of a paper lunch plate and wooden utensils in a waste basket located near an open door which gave access to the hospital grounds. T bolted through the door, the attendant failed to pursue him diligently and he effected his escape. Four days later T was operating a stolen car at an excessive speed on the wrong side of the roadway, while fleeing from the scene of a burglary, and crashed head-on into a car occupied by appellees. The trial court found that this conduct of T was reasonably foreseeable by the State, as an expectable consequence of negligence in permitting T to escape, and that the

State's negligence in permitting the escape was a proximate cause of the collision and appellees' injuries.

## II.

The rule which appellees seek to apply is expressed in RESTATEMENT OF TORTS 2d § 319:

> § 319.  Duty of Those in Charge of Person Having Dangerous Propensities
>
> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

The comment to this section is as follows:

> a.  The rule stated in this Section applies to two situations. The first situation is one in which the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal. The second situation is one in which the actor has charge of a third person who does not belong to such a class but who has a peculiar tendency so to act of which the actor from personal experience or otherwise knows or should know.

The liability of the State for negligence in exercising control over persons in its custody is to be judged under the same principles of tort liability as those which determine the liability of private individuals in the same circumstances. HRS § 662-2; *Upchurch v. State*, 51 Haw. 150, 454 P.2d 112 (1969). Exceptions from liability so determined are provided in HRS § 662-15. In the view we take of this case we do not reach consideration of these exceptions, upon which the State does not rely. Nevertheless, the fact that general principles of tort liability are applicable does not place beyond our consideration the fact that the duty of care relied upon by appellees arose out of the State's custody of a mental patient in an institution designed and operated to administer therapeutic care and treatment. The black letter text of § 319, if it is

assumed to correctly snythesize the disparate conclusions in these cases, leaves for case-by-case determination what constitutes the exercise of reasonable care to control the person in custody. Clearly, both the purpose of the detention and the foreseeable risks of setting the detained person at liberty are to be considered in making that determination. Thus, in affirming a judgment for the government in an action under the Federal Tort Claims Act, 28 USC §§ 1346(G) and 2674, for injuries inflicted by a mental patient who had been released on therapeutic leave, the Fourth Circuit Court of Appeals recognized that the benefits to the patient were to be balanced against the risks to the patient and society in granting such leaves. *Eanes v. United States*, 407 F.2d 823 (4th Cir. 1969). Cases collected in an annotation at 38 A.L.R. 3d 699 (1971) are to much the same effect.

A confusing aspect of the present case is presented by the fact that T was in a dual status as a resident of the State hospital on August 29, 1972. Although he had been administratively conditionally discharged to the Halawa jail on June 2, 1972, his commitment by the court order of September 25, 1969 had not been discharged by court action. So far as this record discloses, T remained a committed mental patient, subject to the order of February 10, 1970, permitting leaves of absence. T had also been placed in detention at the State hospital for the purposes of a mental examination to determine his criminal responsibility in a pending prosecution. The responsibilities of the hospital authorities and their consequent duties of care in the detention of T were arguably different in relation to each status which T occupied.[2]

Whatever differences may have existed in the duty of care arising out of each status, however, liability would in all cases

---

[2] For example, in their relationship to T as a committed mental patient, the hospital authorities may have owed no duty toward appellees to restrain T from leaving the hospital if his mental condition, as then professionally diagnosed, would have justified the granting of a leave of absence. Similarly, the hospital authorities may have owed no duty toward appellees to restrain T under the order for psychiatric examination if T was entitled, by posting bail, to secure his release. T's bail, in Cr. No. 44452, had been set at $1000.

be predicated upon the same principle. This principle was stated in *Rodrigues v. State*, 52 Haw. 156, 174, 472 P.2d 509, 521 (1970): "Thus a further limitation on the right of recovery, as in all negligence cases, is that the defendant's obligation to refrain from particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous". The orders issued to subordinates in the hospital staff requiring them to prevent T from leaving the hospital created obligations which they owed to their superiors but did not in themselves create duties owed to appellees. *Excelsior Ins. Co. of New York v. State*, 296 N.Y. 40, 69 N.E.2d 553 (1946); *Clemente v. United States*, 567 F.2d 1140 (1st Cir. 1978). Similarly, duties were owed by the hospital authorities to the court arising out of the commitment orders and the orders for mental examination, but these orders did not in themselves create duties owed to appellees. Appellees must rely, as they do, upon the rule expressed in RESTATEMENT OF TORTS 2d § 319. Assuming, without deciding,[3] that the state hospital authorities had so taken charge of T as to become subject to that rule, we turn to the question

---

[3] A substantial body of authority imposes liability upon a state with respect to harms committed by prisoners or mental patients who are negligently released or permitted to escape. Annotations — Liability of public officer or body for harm done by prisoner permitted to escape, 44 A.L.R. 3d 899 (1972); Liability of one releasing institutionalized mental patient for harm he causes, 38 A.L.R. 3d 699 (1971). Yet liability is generally denied for failure of the state to restrain the same individual before he has been physically apprehended, except where official action has increased the risk of harm. Cf. *Freitas v. City and County of Honolulu*, 58 Haw. 587, 574 P.2d 529 (1978); *Walters v. Hampton*, 543 P.2d 648 (Wash. App. 1975). Prevention of harm may be accomplished by preservation of general order or by detention of potentially harmful individuals. Both methods involve much the same questions of policy and allocation of public resources. The present is a period of expanding expectations of government action. Where a duty assigned to a public employee is ineptly performed, but the risk of harm to individuals in the community is not increased thereby as compared to that which would have existed had no governmental action been attempted, there may be strong policy considerations against recognizing governmental tort liability for the harms which the public employee failed to prevent. Whichever way this issue is resolved, however, liability to the individual who suffers such harm does not extend beyond the limits defined by general principles of negligence law, which we apply in this case.

whether appellees were foreseeably endangered by the failure of the State hospital authorities to prevent T's escape and whether the risk or hazard of T's negligent operation of an automobile was what made that conduct by the State hospital authorities unreasonably dangerous.

III.

The findings of fact by the trial court which are significant to the issue of the State's duty of care to appellees are as follows:

19. Mr. [T's] escape was the result of negligence on the part of the Defendant State of Hawaii.

20. Prior to and on August 29, 1972 when Mr. [T] escaped, the Defendant State of Hawaii had ample knowledge of Mr. [T's] difficulty in controlling himself, his inability at times to conform his conduct to the requirements of the law, his prior acquittal of charges of crime for reason of insanity and his propensities to escape, commit crimes, thefts, car stealing and dangerous operation of automobiles, without a driver's license.

21. In the particular case in which the order was made requiring Mr. [T] to be held in detention at the State Hospital for a mental examination, i.e. Criminal Number 44452, the Court acquitted Mr. [T] of the charges for reason of insanity.

22. Prior to and on August 29, 1972 the Defendant State of Hawaii knew that Mr. [T] had a fascination for cars and had never been licensed to drive a car.

23. On September 2, 1972, four days after his escape Mr. [T] operated a car at an excessive speed of 65 miles per hour on the wrong side of the roadway and collided headon into a motor vehicle occupied by the Plaintiffs and the Plaintiffs were free of any contributory negligence.

24. The car which Mr. [T] was operating had been stolen and he was fleeing from the scene of a burglary and the police at the time of the collision.

25. The conduct of Mr. [T] described in findings 23 and 24 above was expectable.

26. The conduct of Mr. [T] described in said findings 23 and 24 was something which was reasonably foreseeable by the Defendant State of Hawaii from any negligence in permitting Mr. [T] to escape.

27. Said negligence on the part of Defendant State of Hawaii was a proximate cause of the collision between the cars on September 2, 1972 and the injuries and damages sustained by the Plaintiffs.

Appellees suffered their injuries as a consequence of T's negligent operation of an automobile. The question which the *Rodrigues* test presents is whether the risk to appellees of such conduct by T was sufficiently foreseeable by the hospital authorities as to require the exercise of reasonable care to control T to prevent him from doing such harm. Thus the foreseeability of T's escape from the hospital, his theft of an automobile and his attempt to commit a burglary are insufficient to meet the *Rodrigues* test if it was not also foreseeable that T would operate the stolen car in a negligent manner so as to endanger others on the road. No expert testimony was offered to establish the foreseeability of such conduct on the basis of T's psychiatric history and diagnosis. The psychiatric history contained in the record does not suggest that any attempt had been made to determine the likelihood that T, if he found himself in possession of an automobile, might operate it so as to endanger both himself and others. Moreover, the foreseeability of future conduct on the basis of psychiatric examination and diagnosis is subject to serious question. See, *e.g.*, Diamond, The Psychiatric Prediction of Dangerousness, 123 U. Pa. L. Rev. 439 (1974); *People v. Burnick,* 535 P.2d 352, 365 (Cal. 1975).

The trial court found that the State had knowledge of T's propensities to dangerous operation of automobiles and "a fascination for cars", as well as that he had not been licensed to drive a car. From our examination of the record, it is apparent that this finding is predicated upon narrative reports or diary entries contained in T's hospital charts, recording what was believed by various hospital employees to have

occurred during several of T's absences from the hospital. Two incidents of car theft in 1968 are reported. In the first incident, according to what is recorded as T's own report, T took a car from a parking lot in Waikiki, drove recklessly at high speed through Waikiki, damaged the car slightly by scraping against a curb and returned it to the parking lot. In the second incident, T reportedly damaged a car while attempting to take it from a parking lot in Waikiki and, according to the lot attendant, attempted to run him down. Appellees have directed our attention to these incidents by their briefs, but have not called our attention to any other incident involving the dangerous operation of an automobile by T nor have we discovered any in our search of the record,[4] although many absences from the State hospital are reported.

These two incidents of automobile operation by T in 1968 constitute the only evidence which tends to support the finding that T had a propensity for dangerous operation of automobiles which was known to the State on August 29, 1972. Knowledge of such a propensity would have much the same significance in laying a foundation for a claim based on the State's negligence in permitting T to be at large and able to obtain possession of an automobile as it would for a claim based on the negligent entrustment of an automobile to an incompetent driver. In *Abraham v. Onorato Garages*, 50 Haw. 628, 446 P.2d 821 (1968), we had occasion to consider the sufficiency of known prior incidents to charge an entruster with knowledge of a driver's incompetency. A hit and run conviction involving a parked automobile some four years prior to the entrusting, plus an earlier joyriding conviction, were held insufficient to permit a jury to find negligent en-

---

[4] A copy of a Juvenile Detention Report of the Honolulu Police Department, dated December 31, 1962, is contained in the State hospital records and is Plaintiff's Exhibit 14. This report shows that T was seen operating an automobile in Waikiki and was held in custody after a near collision. It can be inferred from the report that the automobile had been stolen but that upon learning that T was a resident of the State hospital the matter was dropped. Although a near collision is mentioned, there is nothing to indicate in what manner T operated the car.

trustment.[5] The facts of which the State may have had notice in the present case provide even weaker inferences of a propensity to operate an automobile dangerously than those which we held to be insufficient in *Onorato Garages*.

It is clear that liability for injuries suffered by appellees must be predicated on the foreseeability of the risk which produced the injuries and cannot be supported by the foreseeability of other risks of harm to appellees. In *Rodrigues*, we affirmed an award of damages to plaintiffs' property but remanded for further consideration of plaintiffs' claim for mental suffering caused by the same act of negligence by the State. Upon remand, the trial court was directed to consider the foreseeability of serious mental distress to the plaintiffs although the foreseeability of damage to their property had already been determined. Thus we do not view as relevant to the question of the State's liability for T's negligence in operating the stolen car the findings of the trial court that the State was on notice of T's "propensities to escape, commit crimes, thefts, (and) car stealing". An illustration of the distinction we draw is to be found in the companion cases of *Green v. State*, 91 So. 2d 153 (La. App. 1956), and *Webb v. State*, 91 So. 2d 156 (La. App. 1956). In *Webb*, the wounding of plaintiff in her home by an escaped prisoner was held a foreseeable consequence of the State's negligence in permitting him to escape and to obtain a pistol. In *Green*, on the other hand, the injury of plaintiff by the negligent operation of an automobile by an escaped prisoner was held not to be a foreseeable consequence of the State's negligence in permitting him to escape.

Whether the facts before the trial court in the present case permitted a finding that the risk of negligent operation of the

---

[5] We incorporated into the negligent entrustment holding the conclusion, expressed with respect to the negligent promotion issue, that "even if the hit and run conviction were known or imputed to the employer, we are not convinced that this single incident occurring some four years prior to the promotion to manager would be sufficient to permit a jury to decide that a driver was incompetent to such a degree that his retention in service would be at the employer's risk". *Id.* at 633, 446 P.2d at 825-26.

stolen car by T was sufficiently foreseeable to meet the *Rodrigues* test of liability on the part of the State is a question of law upon which the court is not bound by the trial court's finding. In *Kelley v. Kokua Sales & Supply, Ltd.*, 56 Haw. 204, 532 P.2d 673 (1975), we affirmed a summary judgment for defendant upon our conclusion that, as a matter of law, the risk of harm to plaintiff of serious mental distress was not sufficiently foreseeable to include the plaintiff among those to whom defendant's duty of care extended in the operation of a motor vehicle. As we pointed out in *Kelley*, the recognition of foreseeability and the consequent duty of care is an expression of the result of balancing policy considerations.[6] The present case falls into a category in which the courts have consistently refused to find that the foreseeability test has been met.

The negligent operation of an automobile by an escapee from a penal or mental institution has, in all the cases which have come to our attention, been held to be so remote or unforeseeable a consequence of the negligence which permitted the escape that no liability has been imposed on the escapee's custodian for the resultant injuries. *Green v. State, supra; Azcona v. Tibbs,* 12 Cal. Rptr. 232 (Cal. App. 1961); *West Virginia v. Fidelity & Casualty Co.,* 263 F. Supp. 88 (D.C. W. Va. 1967); *Dunn v. State,* 29 N.Y.2d 313, 327 N.Y.S.2d 622, 277 N.E.2d 647 (1971); *Pemberton v. Commonwealth,* 398 S.W.2d 487 (Ky. 1966); Annotation, Liability of public officer or body for harm done by prisoner permitted to escape, 44 A.L.R. 3d 899 (1972). In *Williams v. State,* 127 N.E.2d 545 (N.Y. 1955),. a prisoner without a history of violence escaped from a minimum security prison farm and caused the death of a local farmer by brain hemorrhage

---

[6] "Thus, notwithstanding our sympathies for the apellants for their loss and for the suffering of and death of Mr. Kelley, a reevaluation of the various considerations pertinent to the question of an untrammeled liability of the appellees leads this court to conclude, as a matter of law, that the appellees did not owe a duty to refrain (duty of care) from the negligent infliction of serious mental distress upon Mr. Kelley.

"Stated in a different terminology, but reaching the same conclusion as above, we hold that the appellees could not reasonably foresee the consequences to Mr. Kelley." *Id.* at 209, 532 P.2d at 676.

brought on by fright when he was forced to carry the escaped prisoner in his truck. Liability on the part of the state was denied for lack of foreseeability of the risk. The court placed its decision both on conventional legal principles and on public policy to avoid discouraging the use of minimum security penal facilities, pointing out that in the absence of a foreseeable risk to the decedent the state did not owe him a duty distinct from its public duty to avoid premature return of the prisoner to society.

The standard by which the State's duty to appellees is to be determined in the present case also has a relation to the legal and medical ambiguities with which the administrators of the State hospital must deal. The record shows that a policy of minimum security had been extended to T, in his status as a committed mental patient, by a court order permitting leaves of absence. Upon a showing that he was not dangerous to himself or others, T might have asserted his constitutional right to freedom as declared in *O'Connor v. Donaldson*, 422 U.S. 563 (1975), subject to inquiry whether his confinement was necessary to his treatment. The test of foreseeability of risk which determines the State's duty of care to appellees does not produce a different result whether T's status is viewed as that of a patient or of a prisoner under psychiatric examination. The duty of care which is imposed upon the administrators of the State hospital should be one which arises out of an appropriate balancing of the interest in protection of individuals from foreseeable harms and the interest in use of therapeutic procedures which afford hope of returning mental patients to the community as useful members of society. These considerations militate against a rule which requires preventive detention of mental patients in the absence of discernible risks. *Eanes v. United States, supra, Hilscher v. State,* 64 Misc. 2d 368, 314 N.Y.S.2d 904 (1970); Note: Liability of Mental Hospitals for Acts of Their Patients Under the Open Door Policy, 57 Va. L. Rev. 156 (1971).

We conclude that the record does not permit a finding of actionable negligence by the State in this case under the *Rodrigues* test. The judgment is reversed.

*Charlotte E. Libman,* Deputy Attorney General, State of Hawaii, for defendant-appellant.

*Herbert K. Shimabukuro (Nishimura, Lee & Shimabukuro* of counsel) for plaintiffs-appellees Ajirogis.

*David H. White (Okano, Noguchi & Wong* of counsel) for plaintiff-appellee Furuta.

### DISSENTING OPINION OF KOBAYASHI, J., WITH WHOM CIRCUIT JUDGE SODETANI JOINS

In my opinion, the State's liability for the injuries suffered by Ajirogi can be found on either of two approaches:

### I. Duty:

Section 319, Restatement of Torts 2d, provides:

Duty of Those in Charge of Person having Dangerous Propensities

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

The comment to this section is as follows:

*a.* The rule stated in this section applies to two situations. The first situation is one in which the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal. The second situation is one in which the actor has charge of a third person who does not belong to such a class but who has a peculiar tendency so to act of which the actor from personal experience or otherwise knows or should know.

It is uncontested and admitted by the majority in their opinion that at the critical date of August 29, 1972, the State had charge (committed, had custody or held in detention) of T.

T's commitment to the State hospital as an insane person by court order of September 25, 1969, remained *undischarged* by court action. T had also been placed in detention at the State hospital for the purposes of a mental examination to determine his criminal responsibility in a pending prosecution.

In the prosecution which was pending, T escaped from the State hospital prior to any disposition of T's status by the trial court, based on a report of a panel of medical experts, and in accordance with the provisions of HRS § 711-91 (1968).

No one doubts that the State was negligent, as the trial court found, in permitting T to escape.

In my opinion, clearly, Section 319, Restatement of Torts 2d, applies and the State was under a duty to exercise reasonable care to control T to prevent T from harming appellees. *Jones v. United States,* 399 F.2d 936 (1968); *Thall v. State,* 69 Misc.2d 382, 329 N.Y.S.2d 837 (1972); *Weihs v. State,* 267 A.D. 233, 45 N.Y.S.2d 542 (1943); *Williams v. State,* 308 N.Y. 548, 127 N.E.2d 545 (1955); Annotations — Liability of public officer or body for harm done by prisoner permitted to escape, 44 A.L.R.3d 899 (1972); Liability of one releasing institutionalized mental patient for harm he causes, 38 A.L.R.3d 699 (1971).

As the opinion of the majority shows, T has been, from the age of 12, diagnosed as mentally retarded, mentally ill, insane, and/or suffered from mental disorders. The State hospital knows T very well and has a long record in regard to T's frequent confinement at the State hospital. The State was fully aware of T's propensities to harm himself and the person and property of others.

The majority in their opinion minimize the knowledge had by the State of T's propensities to harm himself or the person or property of others.

Further, the majority misconstrue *Abraham v. Onorato Garages,* 50 Haw. 628, 446 P.2d 821 (1968). In *Onorato,* this court did not hold that "a hit and run conviction involving a parked automobile four years prior to the entrusting, plus an earlier joyriding conviction, were *held insufficient* to permit a jury to find negligent entrustment." (Emphasis added.)

This Court, in *Onorato*, actually stated: "There is *no evidence* that *Onorato had any knowledge* of this criminal record. *Therefore, it cannot be held liable . . . unless* it should have known about the facts which purportedly demonstrated McCoy's incompentency. . . ." (Emphasis added.) *Id.* 50 Haw. at 633, 446 P.2d at 825.

Clearly, either alternatives stated in the commentary to Section 319 applies herein. The State failed to exercise reasonable care to control T to prevent T from harming the appellees.

The liability of the State for negligence in exercising control over persons in its custody is to be judged under the same principles of tort liability as those which determine the liability of private individuals in the same circumstances. HRS § 662-2; *Upchurch v. State*, 51 Haw. 150, 454 P.2d 112 (1969).

## II. Foreseeability:

In my opinion, the majority in their opinion misconstrue the tenor of the court's opinions in both *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509 (1970), and *Kelley v. Kokua Sales & Supply, Inc.*, 56 Haw. 204, 532 P.2d 673 (1975).

In both *Rodrigues* and in *Kelley* the court supported the general rule that duty is primarily a question of law. In *Rodrigues* the court states:

> Duty, however, is a legal conclusion which depends upon "the sum total of those considerations of policy which *lead the law* to say that the particular plaintiff is entitled to protection." (Emphasis added.)

52 Haw. at 170, 472 P.2d at 518.

In *Kelley v. Kokua Sales & Supply, Inc., supra,* the court states:

> Without a reasonable and proper *limitation of the scope of the duty of care* owed by appellees, appellees would be confronted with an unmanageable, unbearable and totally unpredictable liability.

. . . . .

Thus, notwithstanding our sympathies for the appellants . . . a reevaluation of the various considerations . . . leads this court to conclude, as a *matter of law*, that the appellees *do not owe a duty to* refrain (duty of care) from the negligent infliction of serious mental distress upon Mr. Kelley. (Emphasis added.)

56 Haw. at 209, 532 P.2d at 676.

In *Kelley* this Court dealt with the matter of foreseeability only in connection with limiting "the scope of the duty of care", and only incidentally concluded that the consequence to Mr. Kelley was not foreseeable. Furthermore, *Kelley* can be clearly distinguished from the instant case. In *Kelley*, if this court did not limit the "scope of the duty of care", the liability of the actor could have been premised on a worldwide basis. Such a possibility does not exist in the instant case. And there is no such urgency or policy requirement herein to limit the "scope of the duty of care" of the State.

As stated in *Carreira v. Territory*, 40 Haw. 513 (1954), at 517:

. . . but where there is no conflict from the evidence and but one inference can be drawn from the facts, it is the duty of the court to pass upon the question of negligence and proximate cause as questions of law.

That is not the case herein, as tacitly admitted by the majority in their opinion.

Clearly, in the instant case, foreseeability is a question of fact as determined by the trier of fact.

In *Farrior v. Payton*, 57 Haw. 620, 562 P.2d 779 (1977), this Court quoted with approval the following from *Machacado v. City of New York*, 365 N.Y.S. 2d 974 (1975):

"It is for a jury to determine whether the owner had the duty to do other than erect the fence knowing that it bordered upon a sidewalk used by the public and that his dog had the propensity to charge at and frighten passing pedestrians.

"*Similarly, the issues of proximate cause and foreseeability are questions of fact.* . . .

"The exercise of reasonable care transcends the fence itself thereby requiring a jury's examination of all of the

circumstances leading up to the injury.

"Whether an owner owes no further duty than to erect a fence under the circumstances of this case and without other reasonable safeguards or restraints is a question to be answered by community standards through a jury's verdict." (Emphasis added.)

57 Haw. at 631-32, 562 P.2d at 787. *See also, McKenna v. Volkswagenwerk,* 57 Haw. 460, 558 P.2d 1018 (1977).

The majority of the Court, however, simply disregard the findings of fact of the trial court as listed in part III of the opinion of the majority. The majority, by improperly relying upon *Rodrigues* and *Kelley,* conclude that "the court is not bound by the trial court's findings."

Yet, Rule 52(a), HRCP, provides that, "in all actions tried upon the facts without a jury . . . findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *See Associated Engineers & Contractors, Inc. v. State,* 58 Haw. 187, 567 P.2d 397 (1977).

In my opinion, the findings of fact of the trial court are sufficiently, in fact strongly, supported by the record herein.

The foreseeability of the risk of harm is stated by *Prosser, Law of Torts,* 4th ed. at 268 (1971), as in "universal agreement that what is required to be foreseeable is only the 'general character' or 'general type' of the event or the harm, and not its 'precise' nature, details, or above all manner of occurrence."

I see no ground to reverse the trial court. In fact, on the matter of balancing policy considerations, in my opinion, this case is an outstanding case wherein the State must be held liable for its dereliction and be required to pay for the harm resulting to the appellees. Sense of justice and equity calls for such a result.