MS. JACQUELINE FOCHTMAN, Individually, and as Administrator for PHILLIP ROY CRIST, deceased, Plaintiff-Appellant, *v.* HONOLULU POLICE AND FIRE DEPARTMENTS; CITY AND COUNTY OF HONOLULU, a municipal corporation, Defendants-Appellees, and UNIDENTIFIED POLICE OFFICERS, JOHN DOES 1-2, Defendants

NO. 7762

(CIVIL NO. 52500)

AUGUST 16, 1982

RICHARDSON, C.J., LUM, NAKAMURA, PADGETT AND HAYASHI, JJ.

OPINION OF THE COURT BY PADGETT, J.

This is an appeal from a summary judgment entered in favor of the City and County of Honolulu. Plaintiff-Appellant, the parent and administrator of the estate of Phillip Roy Crist, contends that there were genuine issues of material fact which made summary judgment improper. We agree and accordingly, reverse.

The facts as they appear on the record before us are as follows: On January 11, 1977, at sometime after 3:00 p.m., 19-year-old

Phillip Roy Crist and his companion Michael Garvey, went hiking along Hahaione Valley Ridge. At approximately sunset, James Schrader (hereinafter "Schrader"), a resident of Mariner's Ridge, saw what appeared to be a flashlight beam waving frantically near the top of Hahaione Ridge. Schrader observed the light for about ten minutes and noted that the light appeared to be especially frantic whenever aircraft passed over the ridge. Based on his experience as a former Coast Guard officer involved in search and rescue missions, Schrader concluded that someone was in trouble on top of the ridge and decided to call the police. At approximately 6:30 p.m., Police Officers John Souza (hereinafter "Souza") and Peter Carlos (hereinafter "Carlos") arrived at Schrader's residence in response to his call. After the officers talked to Schrader, Carlos attempted, for about 20 minutes and from different vantage points, to locate the light on the ridge with binoculars, but was unsuccessful. During Carlos' attempt, a military helicopter was seen in the area and there was some speculation between Schrader and the officers as to whether or not the helicopter or power lines in the area may have been the source of the light.

After failing to confirm any of Schrader's sightings, both officers left Schrader's residence at approximately 7:00 p.m. In Schrader's deposition he said that immediately before leaving, one of the officers stated that "Well, maybe the power company is working up there or the military could be having some manuvers [sic] up there. We'll check it out." The officers did not, however, do so. Shortly thereafter, Souza called in to report that he was back on patrol and was making a written report of the incident. There is nothing to indicate that the officers called either the power company, the military or the fire department division in charge of rescues. Souza turned in his "Miscellaneous Cases" report at approximately 11:00 p.m. that night.

At approximately 8:30 p.m., appellant became worried about her son and contacted the parents of Michael Garvey to inquire as to the whereabouts of the boys. After some discussion, the police were contacted by the Garveys at about 9:30 p.m. and an "All Points Bulletin" with respect to Michael's car was issued. At approximately 11:00 p.m., Michael's car was found by Officer Russel Miyata at the end of Hahaione Valley Road. Officer Miyata then

informed Police Sergeant Ralph Yamasaki (hereinafter "Yama-saki") that the car had been located and subsequently met Yamasaki at the Fochtman's residence. After some discussion, the officers decided to return to the location of the car and attempted to make verbal contact with the boys by yelling into the valley. When the attempt proved unsuccessful, the officers returned to the Focht-man's residence where Yamasaki called Battalion Chief Clarence Anderson of the Honolulu Fire Department to inquire about a night rescue.

After relating to Anderson the fact that there was a report on two missing hikers and that their car had been found, Anderson stated that they would not attempt a night rescue without addi-tional information pinpointing the location of the hikers. Anderson stated that any rescue attempt would begin at daybreak. After Yamasaki relayed this information to the Garvey's and appellant, it appears Anderson then called Merlin Watson, captain in charge of Rescue 1, Honolulu Fire Department. Watson stated that at 12:45 a.m., he received a call from Anderson in which the plausibility of attempting a night rescue of the missing hikers was discussed. Anderson did not mention that Michael's car had been found, and Watson stated that based on hazardous terrain and the sparse information provided with respect to the location of the hikers, a night rescue should not be attempted.

The rescue attempt began several hours later at daybreak. Two bodies were spotted by helicopter at about 10:00 a.m. and the res-cue team was directed to the area. Upon reaching the bodies, the rescue team discovered that both boys were dead as a result of a fall from the top of the ridge. The bodies were brought out of the valley and identified at about 2:30 p.m. With respect to Phillip Roy Crist, the office of the medical examiner stated the time, date, and cause of death as 2:30 p.m., January 12, 1977, cerebral hemorrhage.

The following day, Schrader heard that two hikers had been found dead in Hahaione Valley. Schrader and the Fochtmans eventually contacted each other and appellant's complaint against the officers and agents of the City and County was filed on Sep-tember 9, 1977.

We begin our discussion of this case by once again stating the well settled rule that summary judgment is to be granted only where there is no genuine issue as to any material fact and the

moving party is entitled to judgment as a matter of law. *Pickering v. State,* 57 Haw. 405, 407, 557 P.2d 125, 127 (1976). In considering whether an issue of material fact exists, "the inferences to be drawn from the underlying facts alleged in the materials (such as depositions, answers to interrogatories, admissions and affidavits) . . . must be viewed in the light most favorable to the party opposing the motion." *Technicolor v. Traeger,* 57 Haw. 113, 551 P.2d 163 (1976); *Ottensmeyer v. Baskin,* 2 Haw. App. 86, 625 P.2d 1069 (1981).

On an examination of the record before us, it is apparent that there are genuine issues of material fact raised with respect to whether or not the actions of Officers Souza and Carlos worsened the situation of appellant's decedent by preventing Schrader from taking further steps to render aid and assistance.

In *Freitas v. City and County,* 58 Haw. 587, 574 P.2d 529 (1978), we stated that the official duty imposed upon the police is largely one to preserve the peace and enforce the laws. In the absence of circumstances creating a duty owed by police officers or the municipalities to take some affirmative action for the protection of the appellant, "failure of police to provide protection is ordinarily not actionable." *Id.,* 58 Haw. at 590, 574 P.2d at 532. In *Namauu v. City and County of Honolulu,* 62 Haw. 358, 614 P.2d 943 (1980), we held that a statute providing that "police shall assist in returning a patient to a facility if he is absent therefrom" did not impose tort liability on police and municipalities under a theory of respondeat superior for failure to apprehend and return an escaped patient to the state mental hospital. The present case, however, is distinguishable from both *Freitas, supra,* and *Namauu, supra,* in that the duty at issue is the duty to avoid any affirmative acts which worsen the situation of the plaintiff. As Prosser states:

> If there is no duty to come to the assistance of a person in difficulty or peril, there is at least a duty to avoid any affirmative acts which makes his situation worse.

Prosser, HANDBOOK OF THE LAW OF TORTS, § 56 (4th Ed. 1971).

In the instant case, a number of depositions were taken and it is apparent from an examination of the whole record that a trier of fact could have concluded that the actions of Souza and Carlos were affirmative acts which worsened the situation of appellant's

decedent. In his deposition, Schrader testified as follows:

Q. When they [the officers] left were you satisfied that they would check into it?

A. Yes. As I say, I really felt that it would be taken care of. And this is why I was so shocked when I found out that they — the boys were dead, and then especially when I found out that nothing was really done. The reports were never put together and that type of thing. I was very unhappy, really unhappy about it.

Schrader also stated that upon discovering that the two boys were dead, he became extremely upset at himself. When he was queried as to the reason, Schrader responded by stating:

A. Well, I should have pushed more — I really should have — to at least got in my car and driven down to the Haaione Valley and looked around down there and see what was happening. And I called KCCN Radio to tell them that I had called the night before on that and they weren't interested in the story at all.

Q. Why did you call KCCN Radio?

A. Well, that's where I heard — I was listening to their station when I heard the news thing and I was really upset something hadn't been done.

In his deposition, Captain Merlin Watson was queried as to what his reaction would have been if he had known that there were distress lights in the area a few hours earlier. Watson responded by stating that:

A. I think I'd roll out, yes, if the individual was to — we were in contact with the plaintiff, whoever's complaining about those lights. If he could pinpoint the area where he last seen the lights, then by all means we'd probably start our hike that night.

In light of the facts and testimony summarized above, we hold that there is a genuine issue of material fact as to whether or not the actions of the police actually worsened the situation of appellant's decedent by preventing Schrader from taking further steps to render aid and assistance. A trier of fact could have concluded that but for the actions of Souza and Carlos, Schrader would have done more to rescue appellant's decedent. The ground we base our decision on is a very narrow one and should not be construed to impose an additional duty upon the police to affirmatively pursue and

follow-up every single call of distress. When the evidence has been more fully developed, a trier of facts may very well come to the conclusion that there was no duty placed upon the officers to do anything more. However, given the inferences which can be drawn from the record presented to us, it is apparent that there are questions which should be presented to a trier of fact, and cannot be disposed of summarily.

Reversed and remanded.

*Jerry I. Wilson (Wilson & Berman* of counsel) for appellant.

*Patrick Border (Edmund L. Lee, Jr.* on the brief), Deputy Corporation Counsel, for appellees.

## DISSENTING OPINION OF RICHARDSON, C.J., WITH WHOM NAKAMURA, J., JOINS

The court concludes summary judgment in defendants' favor was improperly granted because there is a genuine issue of material fact as to whether the actions of the police officers were affirmative acts which worsened the situation of appellant's decedent by preventing someone else from rendering further aid and assistance. It purports to find legal support for overruling the circuit court in this generally phrased excerpt from a treatise:

> If there is no duty to come to the assistance of a person in difficulty or peril, there is at least a duty to avoid any affirmative acts which make his situation worse.

W. Prosser, *Handbook of the Law of Torts* § 56, at 343 (4th ed. 1971). Viewing the inferences to be drawn from the materials considered by the circuit court in the most favorable light to plaintiff, I would conclude as the circuit court did that defendants were entitled to judgment as a matter of law.

I.

If a duty on the part of the defendants to plaintiff's decedent can be established, it would have to be from the following circum-

stances recounted in the court's opinion:

> At approximately 6:30 p.m., Police Officers John Souza (hereinafter "Souza") and Peter Carlos (hereinafter "Carlos") arrived at Schrader's residence in response to his call. After the officers talked to Schrader, Carlos attempted, for about 20 minutes and from different vantage points, to locate the light on the ridge with binoculars, but was unsuccessful. During Carlos' attempt, a military helicopter was seen in the area and there was some speculation between Schrader and the officers as to whether or not the helicopter or power lines in the area may have been the source of the light.
>
> After failing to confirm any of Schrader's sightings, both officers left Schrader's residence at approximately 7:00 p.m. In Schrader's deposition he said that immediately before leaving, one of the officers stated that "Well, maybe the power company is working up there or the military could be having some manuvers [sic] up there. We'll check it out." The officers did not, however, do so. Shortly thereafter, Souza called in to report that he was back on patrol and was making a written report of the incident. There is nothing to indicate that the officers called either the power company, the military or the fire department division in charge of rescues. Souza turned in his "Miscellaneous Cases" report at approximately 11:00 p.m. that night.

Nothing in the foregoing recitation of facts indicates the defendants were aware of the presence of plaintiff's decedent on the mountain ridge, let alone his plight. Moreover, nothing presented to the circuit court tends to substantiate that the decedent's situation was made worse by the failure of the police officers to take affirmative action. The court nevertheless finds a duty owed by the defendants to the decedent may have arisen.

## II.

The majority acknowledges that the controlling precedent in the determination of governmental liability for failure to provide police protection is to be found in *Freitas v. City & County*, 58 Haw. 587, 574 P.2d 529 (1978), and *Namauu v. City & County*, 62 Haw. 358, 614 P.2d 943 (1980). The pertinent principles were stated in

*Freitas* as follows:

> [T]he generally accepted proposition [is] that the failure of the police to provide protection is ordinarily not actionable. See, *e.g., Riss v. City of New York,* 22 N.Y.2d 579, 240 N.E.2d 860, 293 N.Y.S.2d 897 (1968). An exception to this rule has been recognized which imposes liability where police action has increased the risk of harm and there is negligence in providing protection against the enhanced danger. *Schuster v. City of New York,* 5 N.Y.2d 75, 154 N.E.2d 534, 180 N.Y.S.2d 265 (1958). Plaintiffs seek to fit this case into the exception. In order to do so, it is necessary to discover some circumstance, other than their official duty to preserve the peace and enforce the laws, the occurrence or existence of which created a duty owed by the police officers, or the City, or both, to take some affirmative action for the protection of the plaintiffs. It is also necessary for the plaintiffs to show that the affirmative action which was so owed was not taken and that, if it had been, the injuries which the plaintiffs suffered would have been prevented.[1]

58 Haw. at 590-91, 574 P.2d at 532. The majority recognizes that *Freitas* and *Namauu* lend no support to plaintiff's cause.

The instant case, however, is distinguished on grounds that "the duty at issue is the duty to avoid any affirmative acts which worsen the situation of the plaintiff." The purported authority for this proposition is § 56 of Prosser's treatise on torts. Neither § 56 nor its implications escaped us in *Freitas. See* note 1 *supra.* But we viewed the section as supporting a denial of liability in the absence of a showing that "affirmative action which was . . . owed was not taken and that, if it had been, the injuries . . . the plaintiffs suffered would have been prevented." *Freitas v. City & County, supra,* 58 Haw. at 590-91, 574 P.2d at 532. And a fair reading of that portion of the treatise describing the applicability of the exception to the

---

[1] The footnote at this point in the opinion reads as follows:

*See, generally,* Prosser on Torts, § 56 (4th ed. 1971); Note: Municipal Tort Liability for Failure to Provide Adequate Police Protection in New York State, 39 Albany L. Rev. 599 (1975).

The treatise section cited in the footnote is the same section the majority relies on to support the proposition that the instant case is distinguishable from *Freitas.*

general rule cited by the majority sustains our prior reading.[2] For it clearly applies to instances of "misfeasance" following an assumption of duty; it does not serve to create a duty where the putative tortfeasors are unaware of the plaintiff's peril.

"A fundamental requirement of a negligence action is the existence of a duty owed by the defendant to the plaintiff. *Ono v. Applegate,* 62 Haw. 131, 137, 612 P.2d 533, 538 (1980); *see Seibel v. City and County of Honolulu,* 61 Haw. 253, 257, 602 P.2d 532, 536 (1979); *Ajirogi v. State,* 59 Haw. 515, 522, 583 P.2d 980, 985 (1978); *Freitas v. City and County of Honolulu,* 58 Haw. 587, 590, 574 P.2d 529, 531-532 (1978)." *Namauu v. City & County, supra,* 62 Haw. at 361, 614 P.2d at 945. The facts related in the court's opinion indicate that the officers left Schrader's residence after efforts "to confirm any of Schrader's sightings" proved fruitless and that "there was some speculation between Schrader and the officers as to whether or not . . . [a] helicopter or power lines in the area may have been the source of the light." Nothing in § 56 of Prosser, including the cited exception to the general rule, supports the imposition of a duty under such circumstances. *See also Restatement (Second) of Torts* §§ 314, 314A, and 314B (1965). I would affirm the award of summary judgment to defendants.

---

[2] Prosser reads in relevant part:

If there is no duty to come to the assistance of a person in difficulty or peril, there is at least a duty to avoid any affirmative acts which make his situation worse. When we cross the line into the field of "misfeasance," liability is far easier to find. A truck driver may be under no obligation whatever to signal to a car behind him that it may safely pass; but if he does signal, he will be liable if he fails to exercise proper care and injury results. There may be no duty to take care of a man who is ill or intoxicated, and unable to look out for himself; but it is another thing entirely to eject him into the danger of a railroad yard; and if he is injured there will be liability. But further, if the defendant does attempt to aid him, and takes charge and control of the situation, he is regarded as entering voluntarily into a relation which is attended with responsibility. The same is true, of course, of a physician who accepts a charity patient. Such a defendant will then be liable for a failure to use reasonable care for the protection of the plaintiff's interests. And on the same basis one who, without any legal obligation to do so, attempts to remove ice from the sidewalk, may find himself liable when he makes the situation worse.

Prosser, *supra,* at 343-44 (footnotes omitted).