**Nadia MILLER, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 02–CV–1312.

District of Columbia Court of Appeals.

Argued Jan. 8, 2004.

Decided Feb. 5, 2004.

J. Kenneth Kruvant and Joseph B. Espo for appellant.

Donna M. Murasky, Senior Litigation Counsel, with whom Arabella W. Teal, Interim Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel at the time the brief was filed, for appellee.

Before STEADMAN, SCHWELB and GLICKMAN, Associate Judges.

SCHWELB, Associate Judge:

This tragic case, which arises from the accidental death of two children in a fire, requires us once again to consider the reach of the "public duty" doctrine, which generally protects the District, *inter alia,* from liability for alleged negligence on the part of police officers and firefighters in carrying out rescue operations. Nadia Miller, individually and as a personal representative of the estates of her deceased minor children, Tionna Blanchard and Kenisha Blanchard, appeals from an order, entered on October 31, 2002, dismissing with prejudice her action against the District. Ms. Miller brought her suit under the survival and wrongful death statutes, and she also alleged negligent infliction of emotional distress. Ms. Miller contends that if the facts alleged in her pleading are true, as they must be assumed to be for purposes of the District's motion to dismiss, the police owed and breached a special duty of care to her and to the two deceased children, so that the public duty doctrine does not apply. Concluding that the trial court's disposition is mandated by our precedents, we affirm.

I.

In her Amended Complaint, Ms. Miller alleged that on July 14, 2001, a fire broke

out at her home at 446 Lamont Street, N.W., Washington, D.C., at which she was living with her husband and her five children; in addition, a niece and a cousin were sleeping at her home on the day of the fire. The fire was promptly reported but, allegedly as a result of gross negligence on the part of the District, there was an unreasonable delay in the arrival of firefighters and firefighting equipment. Before the firefighters arrived, Ms. Miller's husband threw three of the children out of the window to safety on the ground, where police officers were providing assistance. The Amended Complaint further alleges as follows:

15. After saving the first three children, Nadia Miller looked out the window from her bedroom and saw a Metropolitan Police Department officer, who had been assisting with the rescue of the three children.

16. The police officer called to Ms. Miller, telling her that she should leave the burning house. She responded to the officer that there were two more children trapped in the dwelling who[m] she needed to rescue. At that time the police officer called to Ms. Miller and said that the other two children were safely out of the home and that they were on the side of the house. Only at that time, having been led to believe that all five of her children were safe, did Ms. Miller, with the assistance of her husband, jump from the dwelling. Mr. Miller followed her.

17. After jumping from the burning house[,] Ms. Miller was taken around the side of the house to where the two children described by the police officer were located. It was only then that Ms. Miller discovered that the children were not her children but were a niece and cousin, who had been sleeping on the first floor. Tragically, Ms. Miller's remaining two children remained in the burning house.

The foregoing paragraphs reveal the essence of Ms. Miller's allegations, namely, that by negligently representing to Ms. Miller that all of her children were safe, the police induced her and her husband to jump prematurely from the building, and thus prevented the Millers from rescuing the two children who perished in the fire.[1]

The District filed a motion to dismiss the complaint with prejudice, claiming that the action was barred by the public duty doctrine. The trial judge granted the motion in a seventeen-page written opinion. Correctly noting that, in ruling on the motion, he was required to accept the allegations of the amended complaint as true,[2] the judge "assume[d] that the plaintiff can prove that but for the mistake of the police, she would have remained and rescued the children." Nevertheless, relying, *inter alia,* on *Allison Gas Turbine v. District of Columbia,* 642 A.2d 841 (D.C.1994), the judge applied the public duty doctrine and ruled that the District did not owe "a special duty to the [children], greater than or different from any duty which it owed to the general public." *Klahr v. District of Columbia,* 576 A.2d 718, 719 (D.C.1990) (citations omitted). Ms. Miller filed a timely notice of appeal.

**II.**

We conclude, as did the trial judge, that *Allison* controls. Although there is an

---

1. Although Ms. Miller also faults the firefighters for not attempting a rescue, her principal focus on appeal is on the alleged misrepresentation by the police officer to the effect that Ms. Miller's other two children were safe.

2. The judge cited *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), and *Wanzer v. District of Columbia,* 580 A.2d 127, 128 (D.C.1990).

arguably significant distinction between *Allison* and the present case, reliance on that distinction is foreclosed by our case law.

In *Allison*, a helicopter carrying a pilot and three passengers crashed into the Potomac River. The pilot extracted himself from the helicopter, and he was rescued by civilian scuba divers, but the three passengers remained trapped inside. Initially, the Harbor Patrol had no diving equipment on the scene, and the civilian divers offered to attempt to rescue the passengers. The divers' offer was declined, and the Harbor Patrol ordered the would-be rescuers to stay out of the water. After its own equipment arrived, the Harbor Patrol began rescue operations, but the Patrol's efforts came too late to save the passengers. In opposition to the District's motion for summary judgment, the plaintiff offered the deposition of its medical expert, who testified that the passengers drowned because they were submerged in the river for an extended period of time. The expert believed that if the passengers had been removed from the wreckage within ten minutes of the crash, their chances of survival would have been better than fifty percent.

After suit was brought in the United States District Court for the District of Columbia, the trial judge, relying on the public duty doctrine, granted the District's motion for summary judgment. The plaintiff appealed, and the United States Court of Appeals then certified the following question to this court:

Does the public duty doctrine render the District of Columbia immune from tort liability in a case in which the District police officers interfere with the private rescue efforts of civilians at the scene of

an accident, thereby worsening the condition of the victims?

642 A.2d at 843.

This court held in *Allison* that the District was indeed immune from liability. Writing for the court, Judge King explained the public duty doctrine as follows:

Under the public duty doctrine, the District has no duty to provide public services to any particular citizen. *Hines v. District of Columbia*, 580 A.2d 133, 136 (D.C.1990); *Warren v. District of Columbia*, 444 A.2d 1, 3 (D.C.1981) (en banc); W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 131, at 1049 (5th ed.1984). Rather, "the duty to provide public services is owed to the public at large, and, absent a special relationship between the police and an individual, no specific legal duty exists." *Warren*, 444 A.2d at 3. A "special relationship" may give rise to a "special duty" if there is: "(1) a direct contact or continuing contact between the victim and the governmental agency or official; and (2) a justifiable reliance on the part of the victim." *Platt v. District of Columbia*, 467 A.2d 149, 151 (D.C.1983) (citing *Warren, supra*, 444 A.2d at 11 (Kelly, J., concurring in part and dissenting in part)).

*Id.* Applying the doctrine to the record before it, the court concluded that "the Harbor Patrol officers' conduct was directly related to the officers' 'on-scene responsibility' in conducting the rescue operation." *Id.* at 845. Accordingly, in the court's view, that conduct "was an integral part of the officers' general duty to the public and, therefore, did not create a special relationship." *Id.* (citation omitted). Quoting from the District Court's opinion,[3] this court in *Allison* continued as follows:

---

**3.** The District Court had quoted from *Joy v. Bell Helicopter Textron, Inc.*, 303 U.S.App. D.C. 1, 14, 999 F.2d 549, 562 (1993).

The issue that Allison seeks to put in front of the jury is whether the officers in this case acted as reasonably prudent police officers in preventing the civilians from undertaking the rescue. But the public duty doctrine prevents a jury from deciding precisely these types of issues.... [D]iscretionary acts during a rescue operation can not be later dissected at trial and subject to an expert's opinions as to whether, in hindsight, he acted as a reasonably prudent police officer.

*Id.* at 845. The court opined that the action of the Harbor Patrol officers "may have been motivated by well-grounded concerns about the safety of both the passengers and the civilian scuba divers," *id.*, and that under the public duty doctrine, the court may not second-guess "the exercise of discretion by on-scene personnel in a rescue operation." *Id.* at 846.[4]

In the present case, the trial judge perceived obvious similarities between *Allison* and the case before him. The judge noted that in both cases, the victims allegedly perished because the police prevented private individuals from rescuing them, and that in each case, the officers were engaged in making emergency decisions involving a rescue operation. We think it appropriate to add that in this case, the officers (as well as the parents) were acting under extraordinary pressure, and all concerned were doubtless doing their best to deal with a tragic and terrifying situation.

Notwithstanding the similarities between *Allison* and the present case, there is also a potentially significant difference. In *Allison*, the order to the civilian divers to stay out of the water was obviously a "judgment call" based on the apprehension that the civilians might inadvertently obstruct the operation, or perhaps be injured themselves. Here, the direction to Ms. Miller to jump was not founded on such a judgment call, but rather on an alleged misapprehension (and consequent misstatement) *of fact*—namely, that the two children about whom Ms. Miller was concerned had already been rescued. *Allison* would be more similar to the situation before us if the Harbor Patrol officers had incorrectly told the civilian scuba divers that the passengers *had been rescued.* In *Allison*, the Harbor Patrol made the passengers' condition worse as a result of a discretionary determination; in this case, the police reduced the chances of the children being rescued by allegedly making an incorrect statement of fact. The question is whether the allegedly false or incorrect

4. The court disposed as follows of the plaintiff's reliance on a somewhat analogous decision by a sharply divided Supreme Court of Hawaii:

Appellant cites *Fochtman v. Honolulu Police & Fire Dep'ts*, 65 Haw. 180, 649 P.2d 1114 (1982), which imposed municipal liability because two police officers did not investigate a citizen's report of a flashlight frantically being waved on a nearby mountain ridge. The flashlight was apparently used as an emergency signal device by two injured hikers who were found dead the next morning. *Fochtman, supra*, 649 P.2d at 1115–16. The civilian who reported the light to the police testified that, but for assurances by the police, he would have personally investigated the area near where he had observed the light. *Id.* at 1116–17. An action was brought on the theory that a prompt investigation of the light source would have saved the hikers. *See id.* at 1116. Appellant's reliance on *Fochtman*, however, is misplaced because, under this court's precedent, municipal liability would be barred in that case by the public duty doctrine, since there the officers' "actions and failing were solely related to [their] duty to the public generally and possessed no additional element necessary to create an overriding special relationship and duty." *Nichol* [*v. D.C. Metro. Police Dep't* ], 444 A.2d [1, 3 (D.C.1981) (en banc) ].

statement by the police to Ms. Miller "made [the victims'] condition worse than it would have been had the [rescuers] failed to show up at all or done nothing after their arrival," *Johnson v. District of Columbia*, 580 A.2d 140, 142 (D.C.1990), and thus took the case outside the protection of the public duty doctrine.[5]

We conclude that any attempt to distinguish this case from *Allison* on the basis of the allegedly false statement made by the officers cannot be reconciled with our en banc decision in *Warren*, 444 A.2d 1. In *Warren*, two young women, relying on assurances from the police that help was on the way, attempted to check on the condition of their housemate, who had been raped and sodomized by intruders. In fact, no police officers had been dispatched to the house.[6] The women's inquiry alerted the intruders to their presence, and the women were kidnapped, held captive, raped, robbed and otherwise mistreated. The women subsequently brought suit against the District and, notwithstanding the two telephone calls to the police and the women's reliance on the false assurance that help had been dispatched, a 4:3 majority of the en banc court sustained the dismissal of the action for failure to state a claim upon which relief could be granted.

Considered together, *Allison* and *Warren* stand for the proposition that in a factual scenario such as this one, the actions of the police during a rescue operation are protected by the public duty doc-

trine and are not subject to retrospective dissection at trial. This is true even if the plaintiffs (or, in this case, a person claimed to be in privity with the plaintiffs) relied to their detriment on a negligent misrepresentation of fact on the part of the police, rather than on a discretionary assessment of the rescue scene. In light of these authorities, we conclude that Ms. Miller's amended complaint does not state a claim upon which relief may be granted. Accordingly, the judgment dismissing the action with prejudice is hereby

*Affirmed.*[7]

SCHWELB, Associate Judge, concurring:

Although I join the opinion of the court—indeed, I am its author—I think it appropriate to recognize that some members of our court have expressed the view that, in the District of Columbia, the public duty doctrine has been applied too expansively and too rigidly. *See Warren v. District of Columbia*, 444 A.2d 1, 9–12 (D.C. 1981) (en banc) (Kelly, J., joined by Mack, J., and, in part, by Newman, C.J., concurring in part and dissenting in part); *Powell v. District of Columbia*, 602 A.2d 1123, 1132–37 (D.C.1992) (Schwelb, J., concurring in the judgment). In *Chambers–Castanes v. King County*, 100 Wash.2d 275, 669 P.2d 451, 458 n. 5 (1983), the Supreme Court of Washington, while upholding the public duty doctrine in principle, severely

---

**5.** In *Johnson*, we reversed an award of summary judgment where Emergency Ambulance Firefighters, having responded to an emergency call involving a woman who had suffered a heart attack, allegedly administered cardiopulmonary resuscitation (CPA) in a negligent manner. The woman subsequently died.

**6.** A police car had responded to an earlier call, while the intruders were tormenting the housemate. The first call for help was an-

swered; one officer drove by without stopping and another knocked on the door, but left when no one answered. The second call was made after the police had left the area.

**7.** Substantially for the reasons stated by the trial judge in his written order, we conclude that Ms. Miller's claim of negligent infliction of emotional distress likewise fails. *See Williams v. Baker*, 572 A.2d 1062, 1067 (D.C. 1990) (en banc).

criticized our earlier cases for applying the doctrine too inflexibly. In *Fochtman v. Honolulu Police & Fire Departments,* 65 Haw. 180, 649 P.2d 1114 (1982), the court sustained the sufficiency of a complaint comparable to Ms. Miller's allegations in this case, but this court expressly declined to follow *Fochtman* in *Allison Gas Turbine v. District of Columbia,* 642 A.2d 841, 846 (D.C.1994).

The public duty doctrine might fairly be characterized as the stepchild of sovereign immunity. Sovereign immunity originated with the purported belief (mostly held by kings, queens, princesses and princes) in the divine right of kings. That belief—and one tends to believe whatever is to one's advantage—translated into the doctrine that the king can do no wrong. But when the District of Columbia—today's analogue of those who sat on the throne—wrongs one or more individuals, it should not too readily be permitted to escape liability for the harm that it has caused.

I continue to agree with the following statement by the Supreme Court of Arizona:

> There is perhaps no doctrine more firmly established than the principle that liability follows tortious wrongdoing; that where negligence is the proximate cause of injury, the rule is liability and immunity is the exception.

*Stone v. Ariz. Highway Comm'n,* 93 Ariz. 384, 381 P.2d 107, 112 (1963), *quoted in Powell,* 602 A.2d at 1134 (Schwelb, J., concurring in the judgment). In an appropriate future case, our en banc court should consider whether some of our decisions expounding the public duty doctrine are too much at odds with the foregoing proposition.