Linda L. JOY, Individually and as Legal Representative of Robert A. Joy, Deceased; as Personal Representative and Administratrix of the Estate of Robert A. Joy; and as Guardian and Next Friend of Tatum Joy and Brenna Joy

v.

BELL HELICOPTER TEXTRON, INC., et al.

ALLISON GAS TURBINE DIVISION OF GENERAL MOTORS CORP., Appellant,

v.

Jack C. TURLEY; and the Government of District of Columbia.

Nos. 91–7128, 91–7129 and 91–7168.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 5, 1993.

Decided July 27, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied in No. 91–7128 Sept. 21, 1993.

See also 961 F.2d 963.

Mark A. Dombroff argued the cause for Allison Gas Turbine Div. of General Motors Corp. With him on the brief was Dane B. Jaques. Tom K. Hammitt also entered an appearance for Allison Gas Turbine Div. of GMC.

David N. Webster argued the cause for appellees Linda L. Joy, et al., in No. 91–7128. Sally A. Regal and Julia Porter also entered appearances for Joy, et al.

Jon W. Brassel argued the cause for appellee Jack C. Turley. With him on the brief was James A. McGuire.

Donna M. Murasky, Asst. Corp. Counsel, argued the cause for appellee District of Columbia in Nos. 91–7128 and 91–7129. With her on the brief were John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel.

Before BUCKLEY, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

This case arises out of a 1987 helicopter crash in which all three passengers were killed and the pilot, Jack Turley, was seriously injured. After the crash, the passengers' survivors and Mr. Turley brought suit in district court against Allison Gas Turbine

Division of General Motors Corporation ("Allison"), the manufacturer of the helicopter's engine. Allison, in turn, sought contribution from the District of Columbia for its handling of the attempted rescue, and from Mr. Turley for alleged negligence in flying the helicopter. Prior to trial, the court granted the District's motion for summary judgment on the ground that the "public duty doctrine" rendered the District immune from liability for the actions of the police officers who participated in the rescue effort. A trial was then held, at the conclusion of which the jury returned verdicts for the plaintiffs against Allison. The jury also determined that Mr. Turley was not negligent; accordingly, the court entered judgment in favor of Mr. Turley on Allison's contribution claim.

Allison now appeals these judgments. Its claims of error may be divided into three categories. First, Allison argues that a retrial on liability is warranted because the district court improperly admitted certain evidence and issued erroneous jury instructions. Second, Allison contends that the district court erred by granting judgment in favor of Mr. Turley and the District on the contribution claims. Finally, it asserts that the damages award to plaintiff Linda L. Joy should be reversed because the district court improperly permitted the jury to award damages for loss of consortium and failed to exclude "speculative" expert testimony concerning her late husband's earning capacity.

Finding no fault in the district court's evidentiary rulings or its jury instructions, we affirm the jury's verdict that Allison is liable to the plaintiffs. We also affirm the judgment that Mr. Turley was not negligent in piloting the helicopter, and hence is not liable for contribution. We reverse and remand, however, the damages award to Ms. Joy. Finally, because the question whether the District may be held liable presents a novel issue of D.C. law, we will certify this question to the D.C. Court of Appeals.

## I. Background

### A. The Crash

At approximately 7:30 A.M. on August 21, 1987, a helicopter crashed into the Potomac River in Washington, D.C. The aircraft came to rest upside down and partially submerged. Jack Turley, the pilot, freed himself from the wreckage and was rescued almost immediately by civilians on the scene. The three passengers—Victoria N. Hinckley, Robert A. Joy, and William Weems—remained inside the helicopter.

A number of people in the area observed the crash and placed emergency calls to notify the District's Metropolitan Police Department. In response, the Department immediately dispatched a boat from its Harbor Patrol unit. The boat arrived at the site within approximately three minutes of the crash. Unfortunately, however, the officers on board, at least one of whom was a certified police diver, did not have their scuba diving equipment with them. As a result, they left the scene of the accident to retrieve the equipment.

While the Harbor Patrol officers were gathering their equipment, other Harbor Patrol officers and members of the D.C. Fire Department secured the crash scene. Allison offered an affidavit of a civilian scuba diver who stated that she was present at the scene and had access to diving equipment. She told the officers that she wanted to rescue the passengers, but the officers ordered her not to do so. A second eyewitness reported that "three or four qualified scuba divers" arrived in a boat and offered their assistance. They, however, were also ordered to stay out of the water. Still another eyewitness stated that he began to put on his scuba diving equipment when he saw the crash, but stopped when the Harbor Patrol arrived.

Eventually, the Harbor Patrol divers returned with their gear and commenced rescue operations. The witnesses reported that more than twenty minutes had elapsed between the time of the crash and the time the officers were prepared to dive. Although the police divers were able to remove the passengers from the helicopter, all of them died later in the day. According to Allison's medical expert, Dr. Michael Baden, the passengers did not die from injuries caused by the impact of the crash, but rather from being submerged for an extended period of time.

Dr. Baden testified that if the passengers had been removed within the first ten minutes after the crash, they would have had a greater than 50 percent chance of survival. Dr. Baden also stated that if the passengers had been submerged for more than ten minutes but less than fifteen, it would have been possible, but unlikely, that they would have survived.

## B. The Cause of the Crash

The parties agreed that the helicopter engine lost power because a critical part, the spur adapter gearshaft ("SAG"), failed. The SAG, along with its mating part, the compressor coupler adapter, connects the turbine (power producing) section of the engine to its compressor (air intake) section. The failed SAG was a replacement part manufactured by Allison in 1982 and installed in the engine that year. The SAG had an anticipated useful life of 3,500 hours, but it failed after 1,450.7 hours in service.

Plaintiffs contended that the SAG failed because it had been improperly "carburized" (i.e., hardened) during manufacturing, as shown by an unusual "microstructure" (grain pattern) in the part. By contrast, Allison argued that the SAG failed because (1) the SAG and the compressor coupler adapter had been misaligned during an overhaul by a third party, and (2) foreign material in the engine's oil system blocked the flow of oil through the jet that provided lubrication to the forward spline of the SAG.

In addition to the controversy over the underlying cause of the SAG failure, the parties also disputed whether negligence on the part of Mr. Turley, the pilot, contributed to the crash. A helicopter can be safely landed in the event of an engine failure by performing a maneuver called an "autorotation." The altitudes and airspeeds from which a safe autorotation can be performed are set forth in what is known as a height velocity ("H/V") diagram. If, however, a helicopter is flown within a particular region of the H/V diagram (the "restricted area"), it is extremely difficult to land the helicopter safely in the event of a power failure.

There is little question that, at the time the helicopter lost power, Mr. Turley was flying at an altitude of approximately two hundred feet. The H/V diagram indicates that at that altitude a helicopter's airspeed should be no less than 43 miles per hour. Allison, however, presented eyewitness testimony designed to show that Mr. Turley was flying at a slow airspeed, or perhaps even hovering. Accordingly, Allison claimed that Mr. Turley's negligent piloting was the cause of the crash.

In response, Mr. Turley contended that he was adhering to Federal Aviation Administration restrictions that required him to fly below 200 feet along a specified helicopter route to avoid commercial air traffic coming in and out of National Airport. He further alleged that in accordance with these constraints, he was performing a maneuver known as a "button hook turn" that required him to "transition[ ] through" the restricted area of the H/V diagram. Brief for Appellee Turley at 5.

## II. DISCUSSION

### A. The Substantive Law to be Applied

■ Jurisdiction over this case in the district court was founded on diversity of citizenship pursuant to 28 U.S.C. § 1332. As a result, the substantive tort law of the District of Columbia governs this dispute. *See Schleier v. Kaiser Found. Health Plan of the Mid–Atlantic States, Inc.,* 876 F.2d 174, 180 (D.C.Cir.1989) ("Although the Rules of Decision Act, and hence *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), do not strictly apply with respect to D.C. law, we apply D.C.'s substantive law analogously for reasons of uniformity and respect for the D.C. Court of Appeals."); *see also Williams v. United States Elevator Corp.,* 920 F.2d 1019, 1022 (D.C.Cir.1990) (quoting *Schleier* ).

■ The D.C. Court of Appeals has adopted the principles of strict products liability set forth in section 402A of the Restatement (Second) of Torts. *See Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 720 & n. 6 (D.C.1985); *Berman v. Watergate West, Inc.,* 391 A.2d 1351, 1356–57 (D.C. 1978); *Cottom v. McGuire Funeral Serv.,*

*Inc.*, 262 A.2d 807, 808 (1970). Section 402A imposes liability upon "one who sells any product in a defective condition unreasonably dangerous to the user or consumer," provided that (1) "the seller is engaged in the business of selling such a product," and (2) the product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." Restatement (Second) of Torts § 402A (1965). In order to recover, an injured plaintiff must demonstrate not only that the product is defective, but also that the defect proximately caused plaintiff's injury in that "but for the defect, the injury would not have occurred." *Payne*, 486 A.2d at 725.

■ D.C. law also "recognizes that there may not be a single proximate cause for every injury; several causes may combine to produce the harm." *R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 544 (D.C.1991). Accordingly, a defendant who is held liable for a plaintiff's injury may be entitled to recover contribution from other parties who breached their duties of care in ways that proximately caused the injury. *See id.*

## B. Issues Relating to Liability

### 1. Admission of Evidence Concerning Other SAG Failures

■ In a product liability case, evidence of other incidents involving the allegedly defective product is considered relevant under Rule 401 of the Federal Rules of Evidence, and hence presumptively admissible under Rule 402, "only if a plaintiff shows that the incidents occurred under circumstances substantially similar to those at issue in the case at bar." *Brooks v. Chrysler Corp.*, 786 F.2d 1191, 1195 (D.C.Cir.1986) (quoting *McKinnon v. Skil Corp.*, 638 F.2d 270, 277 (1st Cir.1981)) (internal quotation marks omitted); *see also Exum v. General Elec. Co.*, 819 F.2d 1158, 1162 (D.C.Cir.1987). Even if substantial similarity is demonstrated, however, a district judge may still exclude evidence of other incidents under Rule 403, which provides that

> [a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403; *see Brooks*, 786 F.2d at 1195. A district judge's ruling on whether the requisite degree of similarity has been shown or evidence should be excluded under Rule 403 may be reversed only for abuse of discretion. *See Exum*, 819 F.2d at 1162; *Brooks*, 786 F.2d at 1195.

■ In the present case, the district court permitted plaintiffs to submit into evidence "Technical Data Reports" ("Reports") prepared by Allison that analyzed SAG failures that had occurred in two unrelated accidents. These were introduced during testimony by plaintiffs' expert metallurgist, Dr. Douglas Chisholm. Allison challenges the admission of the Reports. It contends that the SAG failures described in the Reports were not substantially similar to the SAG failure in the present case and that the prejudicial effects of this evidence far outweighed its probative value.

. We turn first to the question of substantial similarity. Although the issue is close, we find that the district court did not abuse its discretion. By contrast with plaintiffs' allegation that the SAG in Mr. Turley's helicopter failed due to improper carburization, a metallurgical defect, the SAG failures discussed in the Reports resulted from severe wear. This difference in the mode of failure weighs against a finding that the incidents were substantially similar. Still, the SAGs described in the Reports broke in precisely the same location as the SAG in Mr. Turley's helicopter (i.e., the forward spline section), and all three failures occurred well before the end of the estimated useful life of the SAGs involved. Notably, we have not required that accidents occur in precisely the same manner in order to qualify as being substantially similar. *Cf. Exum*, 819 F.2d at 1162–63 (holding that the district court erred by excluding evidence of other accidents in a case involving a claim of negligent design, despite the fact that the accidents occurred under somewhat different circumstances

than the accident that was the subject of the suit).

■ More to the point, the substantial similarity standard is relaxed when the unrelated incidents are introduced for a purpose other than to prove that the product was unreasonably dangerous. As we observed in *Exum:*

> How substantial the similarity must be is in part a function of the proponent's theory of proof. "If dangerousness is the issue, a high degree of similarity will be essential. On the other hand, if the accident is offered to prove notice, a lack of exact similarity of conditions will not cause exclusion provided the accident was of a kind which should have served to warn the defendant."

*Id.* at 1162–63 (quoting 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence § 401[10] ). In the present case, plaintiffs introduced the Reports not to establish dangerousness, but rather to refute Allison's suggestion that the SAG in Mr. Turley's helicopter could not have been defective because it was manufactured according to specifications. Indeed, plaintiffs offered to withdraw the evidence if Allison would stipulate that parts can fail despite meeting manufacturing specifications, an offer that Allison refused. Admittedly, the use of the Reports to demonstrate that parts meeting specifications can fail is not so analytically distinct from the matter of dangerousness as is the question of notice. We nevertheless conclude that the difference is sufficient to warrant admission of the evidence concerning the other SAG failures.

Moving to Allison's claim that the Reports should have been excluded under Rule 403, we emphasize at the outset that

> [t]he standard for exclusion under Fed. R.Evid. 403 is somewhat exacting. "Relevant evidence may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice."

*C.A. Assocs. v. Dow Chem. Co.,* 918 F.2d 1485, 1489–90 (10th Cir.1990) (quoting Fed. R.Evid. 403) (emphasis in original); *see also id.* at 1490 (noting that "Rule 403 is an extraordinary remedy to be used sparingly")

(quoting *Wheeler v. John Deere Co.,* 862 F.2d 1404, 1410 (10th Cir.1988)). Moreover, because the district court has distinct advantages over this tribunal in performing the balancing required by the Rule, the district court's discretion is at its height when carrying out this function. *See United States v. Long,* 574 F.2d 761, 767 (3d Cir.1978). Indeed, "[i]f judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *Id.; see also United States v. Boney,* 977 F.2d 624, 631 (D.C.Cir.1992) (quoting *Long* ). In view of these considerations, we find no fault with the district court's ruling.

In attempting to surmount the formidable obstacles to overturning the district court's Rule 403 ruling, Allison relies primarily on *Brooks v. Chrysler Corp.,* 786 F.2d 1191 (D.C.Cir.1986). The plaintiffs in that case argued that a Chrysler Lebaron automobile crashed because its "lip-in dust-boot" permitted corrosive material to enter the braking mechanism, thereby leading to "brake piston seizure." *Id.* at 1192. The district court denied the plaintiffs' attempt to submit exhibits relating to a National Highway Traffic Safety Administration ("NHTSA") investigation of Chrysler cars as evidence of prior occurrences of such seizures. *See id.* at 1192–93. On appeal, we upheld the district court's decision. We noted that the exhibits were only "minimally probative" because they indicated that the primary cause of brake piston seizure was an "out-of-groove" dust-boot, not the entrance of corrosive materials into the braking mechanism. *See id.* at 1195, 1197. We then found that the district court had not abused its discretion by concluding that this limited probative worth was outweighed by the danger of prejudice, delay, and jury confusion. In particular, we emphasized that introduction of the exhibits could have led to extended discussion of the 330 consumer surveys that formed the basis of the investigation, and that those surveys contained, *inter alia,* a number of "highly inflammatory remarks about Chrysler" that might well prove prejudicial. *Id.* at 1198.

Allison's reliance on *Brooks* is misplaced for two reasons. First, *Brooks* held only that the district court did not exceed the bounds of its discretion by *excluding* the plaintiffs'

evidence of other incidents. Accordingly, *Brooks* does not clearly demarcate the boundary of the district court's discretion to *admit* evidence that might have prejudicial implications. Second, the facts of *Brooks* are readily distinguished from the facts of the instant case. In particular, the dangers of undue prejudice and delay were substantially greater with the exhibits proffered in *Brooks* than the Reports admitted into evidence in the present case. While admission of the NHTSA exhibits in *Brooks* would have exposed the jury to significant amounts of extraneous and highly inflammatory material, the Reports contained no such material and played only a minor role during the two-week trial.

### 2. The Jury Instructions

■■■■ It is well established that "[a] defendant is entitled to an instruction on a defense theory if it has a basis in the law and in the record." *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1044 (9th Cir.1987), *aff'd*, 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990). Nevertheless, "[a]s long as a district judge's instructions are legally correct ... he is not required to give them in any particular language," *Miller v. Poretsky*, 595 F.2d 780, 788 (D.C.Cir.1978); and jury instructions are not considered erroneous if, when viewed as a whole, "they fairly present the applicable legal principles and standards," *EEOC v. Atlantic Community Sch. Dist.*, 879 F.2d 434, 436 (8th Cir.1989). An alleged failure to submit a proper jury instruction is a question of law subject to *de novo* review; the choice of the language to be used in a particular instruction, however, is reviewed only for abuse of discretion. *See Hasbrouck*, 842 F.2d at 1044.

■■■■ At the close of the evidence in the present case, the district judge issued the following instructions to the jury on the matter of liability:

You are instructed that the law imposes liability upon a seller of a product which causes injury to another or his property due to a defect in the product, which makes the product unreasonably dangerous.

It is not necessary for the plaintiffs to show that the defendant acted unreasonably or negligently; rather the focus is upon the product itself. A product is unreasonably dangerous when it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases the product.

Thus, if you find that the product, the spur adapter gearshaft, had a defect which made it unreasonably dangerous and that the defect proximately caused the injury to the plaintiffs, then your verdict should be for the plaintiffs.

If you determine, after considering all of the evidence, direct and circumstantial, that the accident which resulted in the plaintiff Turley's injuries and the death of Robert Joy and Victoria Hinckley would not have occurred in the ordinary course of things but for the existence of a defect in the spur adapter gearshaft, then you can infer that the cause of the accident arose from a defect in the manufacture of the spur adapter gearshaft.

The law does not require the plaintiffs to prove the mechanical failure by specific physical evidence, nor does it require the plaintiff to prove exactly what part of the spur adapter gearshaft was defective, as plaintiffs may prove the defect solely by circumstantial evidence.

*The plaintiffs must prove that at the time of the incident that the spur adapter gearshaft was not in a substantially changed condition with respect to the defect alleged.*

*In other words, the plaintiffs must prove, by a preponderance of the evidence, that the spur adapter gearshaft was not substantially changed in a manner that made the spur adapter gearshaft unreasonably dangerous between the time that the engine left Allison's hands and the time of the accident.*

Joint Appendix ("J.A.") at 809–11 (emphasis added).

Before issuing these instructions, the district court denied Allison's request that the instructions focus on whether the *engine* was in a substantially changed condition at the time of the accident, rather than whether the

SAG had been substantially changed. Allison now argues that the district court's instructions were erroneous because they eliminated from the jury's consideration the basic theory of Allison's defense: that the crash was caused by either misalignment of the SAG or the use of contaminated oil that blocked the lubrication system. According to Allison, both of these changes occurred long after the engine left its control, but could not be considered under the district judge's instruction, which would render Allison liable so long as the SAG was not in a substantially changed condition.

We find no merit in Allison's claim. As an initial matter, the district court's instruction fairly stated the applicable law. Both parties agree that the helicopter's engine lost power because the SAG failed. Accordingly, the relevant issues under D.C. products liability law were whether (1) the SAG was defective at the time it entered the stream of commerce, and (2) the SAG proximately caused plaintiffs' injuries.

Moreover, as plaintiffs argued at trial, an instruction focusing on whether the engine as a whole had been substantially changed might well have been misleading. The engine was manufactured in 1972 and had since been altered in many respects through overhauls and maintenance activities, including the installation of the new SAG in 1982. Under the jury instructions advocated by Allison, however, these changes might have operated as an improper shield against liability. The jury would likely have concluded that the engine as a whole had been substantially changed, thereby leading to a verdict for Allison, even if the SAG was in fact both flawed and responsible for the crash.

Finally, it is specious to claim that the district court's jury instructions prevented the jury from reaching a verdict for Allison if the jury agreed with Allison's theory of the case. If the jury adopted Allison's view that the accident was caused by misalignment or inadequate lubrication, it could have held for Allison on any or all of the following grounds: (1) the SAG was not defective, (2) the SAG had been substantially changed as a result of the misalignment or poor lubrication, or (3) any defect that was present in the SAG was not a proximate cause of the crash.

## C. The Contribution Claims

### 1. The Pilot

Allison raises three claims of error with respect to the judgment that the pilot, Jack Turley, was not negligent, and hence is not liable for contribution. First, Allison contends that the district court erred by refusing its request for an instruction on the doctrine of negligence per se. Second, Allison argues that the district court inappropriately issued an instruction on the "sudden emergency doctrine." Third, Allison asserts that there was insufficient evidence to support the finding that Mr. Turley was not negligent.

#### a. Negligence Per Se

 Under the negligence per se doctrine recognized by the District of Columbia, "where a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred ... [an] *unexplained* violation of that standard renders the defendant negligent as a matter of law." *Ceco Corp. v. Coleman,* 441 A.2d 940, 945 (D.C. 1982) (quoting *Richardson v. Gregory,* 281 F.2d 626, 629 (D.C.Cir.1960)) (emphasis in original); *see also Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.,* 534 A.2d 1268, 1273 (D.C.1987) (quoting *Ceco* ); *Lewis v. Washington Metro. Area Transit Auth.,* 463 A.2d 666, 674 (D.C.1983) (same). If, however, the defendant puts forth evidence excusing the violation, the violation may be considered evidence of negligence rather than negligence per se. *See Rong Yao Zhou,* 534 A.2d at 1274; *Lewis,* 463 A.2d at 674; *Ceco,* 441 A.2d at 945; *cf. Robinson v. District of Columbia,* 580 A.2d 1255, 1257 (D.C.1990) (stating that a violation may be excused if the defendant demonstrates that he did "everything a reasonable person would do" to avoid that violation).

 Prior to closing arguments, Allison requested that the district court instruct the jury on the negligence per se doctrine because there was evidence that Mr. Turley

had violated two Federal Aviation Regulations that were in effect at the time of the accident. Specifically, Allison referred to 14 C.F.R. § 91.9 (1987) (subsequently recodified at 14 C.F.R. § 91.13(a) (1992)), which states that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another," and 14 C.F.R. § 91.79 (1987) (subsequently recodified at 14 C.F.R. § 91.119 (1992)), which provides:

> Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:
>
> (a) *Anywhere.* An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.

According to Allison, the evidence indicating that Mr. Turley was flying at an altitude-airspeed combination within the restricted area of the H/V diagram suggested that Mr. Turley violated these regulations, and thus a negligence per se instruction was in order. The district court, however, refused to issue the requested instruction, and Allison now challenges that ruling.

We find that the district court acted properly in refusing to give the negligence per se instruction. We conclude, first, that section 91.9 is far too general to be the subject of a negligence per se instruction. There is ample authority in D.C. law for the proposition that an alleged violation of a statute or regulation gives rise to a claim of negligence per se only when that statute or regulation sets forth specific guidelines to govern behavior. For example, in *District of Columbia v. Mitchell,* 533 A.2d 629 (D.C.1987), the plaintiff alleged a violation of a statute requiring that the D.C. Department of Corrections be "responsible for the safekeeping, care, protection, instruction, and discipline" of inmates at the Lorton Reformatory. *Id.* at 639. The court observed that "the statute implicitly recognizes a duty of reasonable care under the circumstances, the same common law standard we generally apply in all contexts of alleged negligence." *Id.* The court then determined that "[w]e see nothing in the statute—certainly no specifics—that could give rise to a claim of negligence *per se.*"

*Id.; see also Lewis,* 463 A.2d at 674 (holding that no negligence per se instruction was warranted in a case in which plaintiffs alleged a violation of a building code provision requiring that "neighboring property and structures ... shall be sufficiently supported" while construction was underway). Similarly, in the present case, section 91.9 simply restates the general common law duty that pilots should exercise reasonable care (i.e., they may not be "careless"). As a result, no negligence per se instruction was required.

Allison seeks to avoid this conclusion by arguing that section 91.9 "is not merely a general statement of negligence for which no definable acts would trigger its application." Reply Brief for Appellant at 12. In particular, Allison claims that two National Transportation Safety Board ("NTSB") decisions— *Harris v. Oeming,* [1989–92 Transfer Binder] Av.L.Rep. (CCH) ¶ 22,764, at 15,780 (Apr. 16, 1992), and *Harris v. Holmes,* [1989–92 Transfer Binder] Av.L.Rep. (CCH) ¶ 22,763, at 15,778 (Apr. 16, 1992)—have clearly established that section 91.9 is violated by flying a helicopter at an altitude-airspeed combination within the restricted area of the H/V diagram. These decisions, however, are merely applications of the broad standard set forth in section 91.9. By contrast, a common sense approach to the negligence per se doctrine suggests that specific obligations must be set forth on the face of a regulation for that doctrine to come into play. Moreover, even if it were possible to flesh out a general standard through administrative decisions for purposes of the negligence per se doctrine, the decisions cited by Allison were rendered five years after the accident at issue in the present case. Thus, one can hardly expect these decisions to have provided clear rules to govern Mr. Turley's conduct.

From the standpoint of the negligence per se doctrine, section 91.79(a) suffers from precisely the same defect as section 91.9. Under section 91.79(a), a pilot is required to fly at an altitude from which he may make an emergency landing without "undue hazard to persons or property." This, however, is simply another way of saying that a pilot must exercise "due care." Certainly, it is impossi-

ble to discern from the face of this rule any specific instructions concerning flight operations. *Compare* 14 C.F.R. § 91.79(a) (1987) *with* 14 C.F.R. § 91.79(b) (1987) (making it unlawful to fly an aircraft "[o]ver any congested area of a city, town, or settlement ... [at] an altitude [less than] 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft"); *see also Tinkler v. United States,* 700 F.Supp. 1067, 1073–74 (D.Kan.1988) (finding a pilot negligent for flying in violation of 14 C.F.R. § 91.-79(b)), *aff'd,* 982 F.2d 1456 (10th Cir.1992). Accordingly, as with section 91.9, section 91.-79(a) cannot properly give rise to a negligence per se instruction.

### b. The Sudden Emergency Doctrine

■ Allison's next claim of error concerning the contribution claim against Mr. Turley relates to the district court's decision to issue an instruction on the "sudden emergency" doctrine. Specifically, the judge instructed the jury that

> [i]f you determine from the evidence that the pilot, Jack Turley, was, at the time of the occurrence, confronted with a sudden emergency not of his own making, then you must determine whether, in the light of all of the alternatives available to him, and the time available to him to recognize and evaluate these alternatives, he made a choice that a reasonable, prudent person should have made.

J.A. at 809. Allison contends that this instruction was erroneous because (1) Mr. Turley's alleged negligence—flying at an altitude-airspeed combination within the restricted area of the H/V diagram—was a cause of the emergency; and (2) Allison alleged that Mr. Turley was negligent prior to, rather than after, the engine failed.

We agree with Allison that the sudden emergency instruction does seem inappropriate. The sudden emergency doctrine elaborates the common law standard of reasonable care by directing a jury to consider the constraints imposed on an actor who must make decisions under severe and unanticipated conditions. *See* Restatement (Second) of Torts § 296 cmt. b (explaining that under the doctrine, the jury "in determining the propri-

ety of the actor's conduct must take into account the fact that he is in a position where he must make a speedy decision between alternative courses of action and that, therefore, he has no time to make an accurate forecast as to the effect of his choice"). In the present case, there was testimony that Mr. Turley made decisions after the engine failure that may have affected the likelihood of the passengers' survival. Specifically, he chose to land the helicopter in the Potomac rather than amid the cherry trees by the Jefferson Memorial. Allison, however, did not suggest that Mr. Turley erred in making this choice, or that he acted in any way improperly during the emergency conditions that existed after the engine failed. Instead, Allison claimed only that Mr. Turley had been negligent by flying within the restricted area of the H/V diagram, an action that he allegedly took before the onset of the emergency.

Nevertheless, even if we were to find that the sudden emergency instruction was improperly given, the issuance of the instruction would not constitute reversible error. It is well established that challenges to jury instructions are subject to the harmless error rule. *See* Fed.R.Civ.P. 61; *Williams,* 920 F.2d at 1022–23. Accordingly, reversal is appropriate only if "the trial court's error could have affected the substantial rights of the parties." *Williams,* 920 F.2d at 1023.

In the present case, there is no possibility that the sudden emergency instruction had any adverse effect on the verdict. If the jury had agreed with Allison that Mr. Turley was negligent prior to the engine failure, the sudden emergency instruction would not have inhibited the jury from finding in Allison's favor. Moreover, the instruction left it open to the jury to determine whether Mr. Turley was responsible for the sudden emergency by stating that

> [i]f you determine from the evidence that ... Turley[ ] was, at the time of the occurrence, confronted with a sudden emergency *not of his own making....*

J.A. at 809 (emphasis added). Thus, if the jury concluded that Mr. Turley was responsible for the emergency, as Allison claimed, the instruction would have been irrelevant.

### c. The Sufficiency of the Evidence

We review *de novo* Allison's contention that there was insufficient evidence to support the jury's finding that Mr. Turley was not negligent, and hence that the district court should have set aside the jury's verdict in ruling on the contribution claim. Reversal is appropriate, however, only if "the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable men could not disagree on the verdict." *Anderson v. Group Hospitalization, Inc.*, 820 F.2d 465, 472 (D.C.Cir. 1987) (quoting *Romero v. National Rifle Ass'n of Am., Inc.*, 749 F.2d 77, 79 (D.C.Cir. 1984)) (brackets omitted). Moreover, in evaluating the issue, we must view the evidence in the light most favorable to Mr. Turley. *Id.* Applying this standard, we conclude that the district court acted properly by entering judgment in accordance with the jury's verdict.

Allison's attempt to demonstrate that the evidence was insufficient focuses exclusively on the evidence concerning the helicopter's airspeed at the time the engine failed. Allison observes that the parties agreed that Mr. Turley was flying at an altitude of 200 feet, and that the H/V diagram indicates that a successful autorotation would generally not be possible from that altitude unless the helicopter was travelling at a rate of at least 43 miles per hour. Accordingly, Allison contends that "the only fact for the jury to determine in deciding [Mr.] Turley's negligence was whether he was flying slower than 43 mph when the engine stopped operating." Brief for Appellant at 21. Allison then contends that eyewitness accounts, physical evidence from the helicopter wreckage, and Mr. Turley's pretrial admissions all support the view that he was travelling at considerably less than that speed.

If we agreed with Allison's premise that the determinative issue is whether Mr. Turley was flying at less than 43 miles per hour, we might well accept its preferred conclusion. Indeed, even Mr. Turley admitted during his testimony that he was travelling at an airspeed below the 43 miles per hour threshold at the time the engine failed. Nevertheless, the mere fact that Mr. Turley was flying in the restricted area of the H/V diagram would not necessarily compel a reasonable jury to conclude that Mr. Turley was negligent. To the contrary, the record contains evidence that, when viewed in the light most favorable to Mr. Turley, suggests that he did exercise reasonable care under the particular set of circumstances with which he was confronted.

Mr. Turley testified at the trial that the engine failed while he was performing a button hook turn, and that this turn was necessitated by Federal Aviation Administration ("FAA") restrictions requiring him to fly along a prescribed helicopter route to avoid air traffic coming in and out of National Airport. Mr. Turley further testified that before making the turn he was flying at 55 miles per hour, just under the 60 miles per hour limit imposed by the flotation devices on his helicopter; that performing the turn necessarily led to a decrease in the helicopter's speed; and that it is relatively common for helicopter pilots to "transition through" the restricted area of the H/V diagram at some point during a typical flight to conform to air traffic instructions.

In an attempt to discredit Mr. Turley's account, Allison points to the statements of several witnesses that describe Mr. Turley's helicopter as "hovering" over the Potomac in the minutes prior to engine failure. Based on these statements, Allison contends that Mr. Turley's helicopter was essentially motionless at the time the failure occurred. This evidence, however, is far from unambiguous. Indeed, at least one of the statements directly corroborates Mr. Turley's account. Specifically, Robert Love reported that "the helicopter moved forward and banked off to the right" and that "[j]ust at the end of this motion the engine just quit," J.A. at 159, a depiction that matches Mr. Turley's testimony concerning the button hook turn.

Allison also cites two other pieces of evidence to support its version of events. First, it points to the testimony of Richard Belle, a NTSB investigator, who interviewed Mr. Turley in the hospital shortly after the accident. According to Mr. Belle, Mr. Turley reported that the helicopter was in a "stable hover" at the time of the engine failure. Mr.

Belle noted, however, that Mr. Turley was "groggy" at the time of the interview, and that he appeared to be under the effects of pain medication.

Second, Allison observes that Charles Herron, a Bell Helicopter accident investigator, testified that in his opinion Mr. Turley's helicopter was "at a hover or very low airspeed," which he subsequently estimated to be less than 22 miles per hour. But Mr. Herron stated that this opinion was premised largely on the NTSB witness statements, which, as discussed above, are susceptible of more than one reasonable interpretation.

Thus, we conclude that the evidence is more than sufficient to uphold the jury's verdict. A reasonable jury could readily have concluded that Mr. Turley's account accurately depicted the conditions of the flight, and that his flying within the restricted area of the H/V diagram did not indicate that he failed to use reasonable care under the circumstances, which included most notably the FAA restrictions governing the flight. There are, of course, discrepancies among the various accounts. Resolving these discrepancies, however, is quintessentially a matter for the jury.

### 2. The District of Columbia

▮ The district court granted summary judgment on Allison's contribution claim against the District on the ground that the District was immune from liability under the public duty doctrine. Allison argues that the district court misread existing D.C. precedents. Because we find that Allison's contribution claim presents an unresolved and critically important question of D.C. law, we will certify the question to the D.C. Court of Appeals.

▮ Under the public duty doctrine as it has been elaborated by the D.C. Court of Appeals, the District "and its agents owe no duty to provide public services to particular citizens as individuals." *Hines v. District of Columbia*, 580 A.2d 133, 136 (D.C.1990); *see also Platt v. District of Columbia*, 467 A.2d 149, 151 (D.C.1983). As a result, the District is generally immune from tort liability for actions taken by its officers in the course of providing public services. *See Hines*, 580 A.2d at 136.

There is, however, an exception to the public duty doctrine for cases in which a "special relationship" is established between public officers and a particular individual. A special relationship does not arise merely because an individual requests that the District provide emergency assistance. Thus, the District may not be held liable for the failure of its officers to respond to emergency calls in an "adequate and timely" fashion. *See id.* at 138–39 (finding no special relationship in a case in which emergency medical technicians failed to respond promptly and with the proper equipment to a medical emergency). Nevertheless, a special relationship may exist when "there is justifiable reliance on a specific undertaking to render aid." *Hines*, 580 A.2d at 138; *see also Platt*, 467 A.2d at 151 (finding that a special relationship arises when there is "(1) a direct contact or continuing contact between the victim and the governmental agency or official; and (2) a justifiable reliance on the part of the victim"). A special relationship may also exist if public agents commit acts of "affirmative negligence" that "actually and directly worsen the victim's condition." *Johnson v. District of Columbia*, 580 A.2d 140, 142 (D.C.1990). This "affirmative negligence" concept can be incorporated within the "justifiable reliance" framework on the theory that "a victim may arguably 'rely' on an emergency crew not to worsen h[is] condition." *Id.* at 143.

To the best of our knowledge, the D.C. courts have not addressed the precise question whether interference by the police with civilian rescue efforts may constitute the type of affirmative negligence that can create a special relationship, and thereby give rise to liability on the part of the District. Notwithstanding this silence, the district court determined that no special relationship could be established based on the facts of this case. As an initial matter, the court held that the mere fact that the Harbor Patrol boats "were not equipped with scuba gear when they arrived at the scene" could not provide a basis for liability because this was "essentially an allegation that the District's rescue

operation was untimely and inadequate." *Joy v. Bell Helicopter Textron, Inc.,* No. 88–2165, mem. op. at 9 (D.D.C. Feb. 28, 1991). The court then turned to the affirmative negligence claim. Relying on a Superior Court opinion that was adopted by the D.C. Court of Appeals in *Warren v. District of Columbia,* 444 A.2d 1, 3, 4–9 (D.C.1981) (en banc), the district court reasoned that a special relationship may arise from affirmative negligence only when the alleged actions constitute "ordinary negligence"—that is, actions "for which anyone ... would be held liable"—such as "negligent handling of an attack dog, negligent operation of a motor vehicle, or the negligent use of a firearm." *See Joy,* mem. op. at 11 (quoting *Warren,* 444 A.2d at 7). By contrast, the court found that a special relationship does not arise from "allegations of negligence [that] derive solely from defendants' status as police employees and from plaintiffs' contention that defendants failed to do what reasonably prudent police officers would have done in similar circumstances." *Id.* (quoting *Warren,* 444 A.2d at 8). According to the court, the present case involved the latter type of allegation:

> The issue that Allison seeks to put in front of the jury is whether the officers in this case acted as reasonably prudent police officers in preventing the civilians from undertaking the rescue. But the public duty doctrine prevents a jury from deciding precisely these types of issues. . . . [D]iscretionary acts during a rescue operation can not be later dissected at trial and subject to an expert's opinions as to whether, in hindsight, he acted as a reasonably prudent police officer.[9] We think that the public duty doctrine correctly protects the courts and the public from the legal morass which would arise if these types of discretionary acts were to go to trial.

---

[9] This case provides a telling example of why public officials are held to have a duty to the public at large and not to specific individuals. The officers did not only owe a duty to the passengers stranded in the helicopter, they also had a duty to protect the civilians who wanted to enter the water from harming themselves by attempting a rescue. The officers' decision not

to allow the civilians to attempt a rescue, it must be emphasized, was a discretionary act.

*Id.* at 12–13.

In challenging the district court's decision, Allison argues that the actions of the Harbor Patrol officers constitute precisely the type of affirmative negligence that suffices to create a special relationship. For support, Allison cites *Johnson v. District of Columbia,* 580 A.2d 140 (D.C.1990). In that case, District officers failed to respond to an emergency call concerning a victim who had suffered a heart attack. *See id.* at 141. When two firefighters did arrive on the scene after more than thirty minutes and two additional calls, they allegedly had "no equipment ... other than an oxygen mask and a mouth-to-mouth resuscitation mouthpiece," and acted "casually and slowly" in dealing with the victim's distress. *Id.* The D.C. Court of Appeals held that although the public duty doctrine rendered the District immune from liability for the tardiness of the response and the failure of the firefighters to have appropriate equipment when they arrived, *see id.* at 142, there was a triable question of fact as to whether certain actions taken by the firefighters on the scene could have created a special relationship. *See id.* at 143 (noting allegations that, *inter alia,* the firefighters "failed to provide proper cardiopulmonary resuscitation [and] failed to properly manage [the victim's] airway"). According to the court:

> [T]he only relevant issue is whether any affirmative acts of the firefighters worsened [the victim's] condition. That is, appellant must show that some act of the firefighters in administering emergency medical assistance to [the victim] actually made [her] condition worse than it would have been had the firefighters failed to show up at all or done nothing after their arrival. .

*Id.* at 142. Relying on this language, Allison argues that, by interfering with the private rescue efforts of the civilian scuba divers, the Harbor Patrol officers actually made the passengers' situation "worse than it would have been had the [officers] failed to show up at all." Moreover, Allison observes that in at least one jurisdiction with a similar public immunity doctrine, it has been held that the

government may be found liable for police actions that "actually worsen[ ]" a victim's situation by discouraging civilian rescuers "from taking ... steps to render aid and assistance." *Fochtman v. Honolulu Police and Fire Dep'ts*, 65 Hawaii 180, 649 P.2d 1114, 1117 (1982).

In response, the District argues that Allison cannot establish the "justifiable reliance" element necessary to create a special relationship because "there is *no* evidence that the helicopter passengers were even aware of the MPD's rescue efforts, much less that they relied on such efforts." Brief for Appellee District of Columbia at 11–12 (emphasis in original). This claim is grounded on the notion that a victim must actively manifest his reliance upon his would-be rescuers in order to qualify for the special relationship exception to the public duty doctrine. Such a position, however, is directly contradicted by *Johnson*, in which the court found that the plaintiff's allegations, if proven, were sufficient to provide a basis for liability, despite the fact that the victim was unconscious throughout the District's failed rescue attempt. *See* 580 A.2d at 141.

More substantially, the District likens the present case to *Nichol v. District of Columbia Metropolitan Police Department*, a companion case to *Warren* that was decided in the same opinion. *See Warren*, 444 A.2d at 3–4. In *Nichol*, a vehicle repeatedly rammed the rear of the plaintiff's car. When the plaintiff stopped, the occupants of the other vehicle began to beat him. Shortly thereafter, a police officer arrived on the scene and separated the plaintiff from his assailants. In the process, the officer inhibited the efforts of the plaintiff's companion to learn the assailants' identities, thereby making it impossible for the plaintiff to take legal action against them. *See id.* at 3. Lacking another viable alternative, the plaintiff brought an action against the District alleging that the officer had acted negligently by (1) impeding the effort to learn the assailants' identities and then (2) failing to obtain the information himself. *See id.* The D.C. Court of Appeals, however, held that the suit was barred by the public duty doctrine. The court stated that "the effort to separate the hostile assailants from the victims—a necessary part of the on-

scene responsibility of the police—adds nothing to the general duty owed the public and fails to create a relationship which imposes a special legal duty." *Id.* The District contends that in the present case, as in *Nichol*, the actions taken by the Harbor Patrol officers in barring the civilian scuba divers from undertaking rescue efforts constitute "a necessary part of the on-scene responsibility of the police," rather than the type of "affirmative negligence" that may establish a special relationship.

After reviewing the relevant authorities, we conclude that the question presented by Allison's contribution claim constitutes an appropriate matter for certification to the D.C. Court of Appeals. Under D.C. law, "a Court of Appeals of the United States" may certify "questions of law" to the D.C. Court of Appeals when "it appears to the certifying court [that] there is no controlling precedent in the decisions of the District of Columbia Court of Appeals." D.C.Code Ann. § 11–723 (1989). The use of such certification procedures "in a given case rests in the sound discretion of the federal court." *Lehman Bros. v. Schein*, 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974); *see also Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 426 (D.C.Cir.1988) ("*Tidler*"); *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 884 (D.C.Cir.1985) ("*Home Insurance*"). In the present case, two significant considerations lead us to the view that we should exercise our discretion to certify.

The first and "most important consideration" is that we are "genuinely uncertain" as to whether interference by public officers in private rescue efforts may give rise to a special relationship under D.C. law. *Tidler*, 851 F.2d at 426; *see also Lee v. Wheeler*, 810 F.2d 303, 306 (D.C.Cir.1987) (finding certification appropriate in a case in which the court was "uncertain as to an important point of Maryland law" and "found no pertinent cases from that State authoritatively to guide [it]"); *Home Insurance*, 764 F.2d at 884 (noting "uncertainty of state law" as one factor supporting a decision to certify). Weighing in favor of the view advanced by Allison is the fact that discouraging civilian rescue attempts appears to qualify as an affirmative act, not just an omission, that may well have

left the passengers worse off than if the Harbor Patrol officers had never arrived on the scene. *Cf. Johnson,* 580 A.2d at 142. Moreover, by contrast with the district court's decision, it is at least possible to construe the actions of the Harbor Patrol as the kind of negligence for which "anyone— police or civilian—would be liable." *Warren,* 444 A.2d at 7. Specifically, although a private individual generally has no obligation to rescue a person who is in peril, once he undertakes a rescue he may be liable for negligence committed during that effort. *But see id.* at 7 n. 3 (observing that the D.C. Court of Appeals has refrained from endorsing the negligent rescue doctrine); *see also Johnson,* 580 A.2d at 142 n. 3. Such negligence could well include dissuading or preventing other qualified individuals on the scene from rendering aid when there is a lack of equipment to effectuate the initial rescue plan.

At the same time, there is authority to support the District's view of the case. As the district court noted, the Superior Court opinion adopted in *Warren* drew a distinction between "ordinary negligence on the one hand and a novel sort of professional malpractice on the other." *Warren,* 444 A.2d at 8. In the present case, the actions of the Harbor Patrol officers may have been influenced by a variety of considerations—the danger of injury to the civilian divers, the danger that the civilian divers might have exacerbated the injuries of the passengers, and crowd control issues—that "derive solely from [their] status as police employees." *Id.* Thus, to the extent that Allison's contribution claim is, in effect, a claim that the officers "failed to do what reasonably prudent police employees would have done in similar circumstances," the District should be shielded from liability by the public duty doctrine. *Id.*

Moreover, the District appears to be correct in asserting that this case is in many respects similar to the *Nichol* case that was decided along with *Warren.* As in *Nichol,* the officers in the present case directed well-intentioned individuals at the scene not to take action. Furthermore, just as the officer in *Nichol* had a responsibility to get the

identification information sought by the victim's companion, *see Warren,* 444 A.2d at 3, the officers in the present case had a duty derived from their public safety role to perform essentially the same task the civilian scuba divers hoped to accomplish—rescue the drowning passengers. And, in both cases, the police failed to perform their duty adequately, thereby leaving the victims worse off.

Our decision to certify is also supported by the fact that "this case is one of extreme public importance" in which the District of Columbia has a "substantial interest." *Home Insurance,* 764 F.2d at 884. Indeed, one can hardly imagine a more significant issue for the District than the conditions under which its police officers will be held liable in tort for actions taken in the course of performing their public functions.

In view of the foregoing, we will certify the following question to the D.C. Court of Appeals:

> Does the public duty doctrine render the District of Columbia immune from tort liability in a case in which District police officers interfere with the private rescue efforts of civilians at the scene of an accident, thereby worsening the condition of the victims?

### D. The Damages Award to Ms. Joy

The jury awarded Linda Joy, Robert Joy's widow, $750,000 under the D.C. Wrongful Death Act ("WDA"), D.C.Code Ann. §§ 16–2701 to 16–2703 (1989), along with $500,000 for loss of consortium. It also awarded $500,000 to each of Ms. Joy's two children under the WDA, and $100,000 to Mr. Joy's estate under the Survival Act, *id.* § 12–101. Allison challenges this award on the grounds that (1) loss of consortium damages are not available under the WDA, and (2) the district court improperly permitted Ms. Joy to introduce expert testimony by Dr. John Glennie concerning the income and investment profits that Mr. Joy might have earned and realized had he not perished in the crash. We agree with Allison on both points, and accordingly remand Ms. Joy's case for a retrial on damages.

### 1. Loss of Consortium

At common law, there was no cause of action available to a surviving spouse or next of kin when an individual died as a result of a wrongful act. *See Ciarrocchi v. James Kane Co.*, 116 F.Supp. 848, 850 (D.D.C.1953). The underlying theory was that "a personal right of action dies with the person." *Id.* Because there was no common law right of action, any remedy for wrongful death "had to be by statute." *Id.* The first such statute was Lord Campbell's Act, enacted in England in 1846. This Act did not by its terms restrict recovery in wrongful death cases to the pecuniary losses experienced by a decedent's survivors, but it was so interpreted from the outset. *See id.* at 850–51 (discussing *Blake v. Midland R. Co.*, 10 Q.B. 93 (1852)).

The District of Columbia's wrongful death statute was originally enacted in 1885, Act of Feb. 17, 1885, ch. 126, 23 Stat. 307 (1885), and was substantially revised in 1948, Pub.L. No. 676, § 1, 62 Stat. 487 (1948). *See generally* Chauncey B. Chapman, Jr. & Calvin H. Cobb, Jr., *Recent Statutes, Affecting Wrongful Death, the Survival of Actions, and a Survivor's Testimony in the District of Columbia*, 37 Geo.L.J. 418, 422–24 (1949) (discussing the 1948 revisions). As amended, it provides:

> When, by an injury done or happening within the limits of the District, the death of a person is caused by the wrongful act, neglect, or default of a person or corporation, and the act, neglect, or default is such as will, if death does not ensue, entitle the person injured, or if the person injured is married, entitle the spouse, either separately or by joining with the injured person, to maintain an action and recover damages, the person who or corporation that is liable if death does not ensue is liable to an action for damages for the death, notwithstanding the death of the person injured, even though the death is caused under circumstances that constitute a felony.

> The damages shall be assessed with reference to the injury resulting from the act, neglect, or default causing the death, to the spouse and the next of kin of the deceased person; and shall include the reasonable expenses of last illness and burial. Where there is a surviving spouse, the jury shall allocate the portion of its verdict payable to the spouse and next of kin, respectively, according to the finding of damage to the spouse and next of kin. . . . An action may not be maintained pursuant to this chapter if the party injured by the wrongful act, neglect, or default has recovered damages therefor during his life.

D.C.Code Ann. § 16–2701. Allison contends that this statute does not provide for the recovery of damages for loss of consortium, and we agree.

The sole case that is directly on point is *Ciarrocchi v. James Kane Co.*, 116 F.Supp. 848 (D.D.C.1953). In that case, the plaintiff sought to recover damages for loss of consortium for the allegedly wrongful death of her husband. The court made clear that the WDA authorizes recovery only for "pecuniary losses, which include the value of the lost earnings and of the personal service and attention which would have been of material value to the members of the family, *and not the loss of society and companionship.*" *Id.* at 849–50 (emphasis added). It also declined to extend to cases involving deaths the rule of *Hitaffer v. Argonne Co.*, 183 F.2d 811 (D.C.Cir.1950), *overruled on other grounds by Smither & Co. v. Coles*, 242 F.2d 220, 226 (D.C.Cir.1957), which held that a wife, like a husband, has a common law cause of action for loss of consortium due to a negligent injury to her spouse. *See Ciarrocchi*, 116 F.Supp. at 851. The court observed that the *Hitaffer* holding "did not in any way change or affect the action for damages because of death by wrongful act," and that "[t]he death action, being in derogation of the common law, cannot be liberalized by judicial construction, but must be done by statute." *Id.*

Subsequent decisions by the D.C. Court of Appeals and this court, while not addressing the issue directly, are consistent with *Ciarrocchi.* As an initial matter, the D.C. Court of Appeals continues to emphasize that the "wrongful death statute[ ] must be strictly construed" because it stands as a "derogation[ ] from the common law." *Waldon v. Covington*, 415 A.2d 1070, 1075 n. 17 (D.C.

1980). Moreover, in *Doe v. Binker*, 492 A.2d 857 (D.C.1985), the court described the damages recoverable under the WDA in essentially the same terms used in *Ciarrocchi*, omitting any reference to damages for loss of consortium. *See id.* at 863. Specifically, the court stated that a WDA plaintiff was entitled to recover only for (1) "pecuniary loss—calculated as the annual share of decedent's dependents in the decedent's earnings, multiplied by the decedent's work life expectancy, and discounted to present value"; and (2) "the value of the services lost to the family as a result of decedent's death." *Id.* Finally, in *Elliott v. Michael James, Inc.*, 559 F.2d 759 (D.C.Cir.1977), this court noted that "[e]ven though a few states may have permitted recovery for ... loss of decedent's 'society,' we have not so ruled." *Id.* at 767 n. 19.

Perhaps more telling than these decisions is the utter absence of authority to support Ms. Joy's position. Indeed, Ms. Joy is unable to cite any D.C. or Federal court case that sanctions the award of loss of consortium damages under the WDA.

In arguing that damages for loss of consortium should be available, Ms. Joy relies heavily on the legislative history of the Anti-Sex Discriminatory Language Act ("ASDLA"), D.C.Law 1–87, 23 D.C.Reg. 1134 (Aug. 10, 1976) (designated as D.C.Law 1–87 at 23 D.C.Reg. 2544 (Oct. 22, 1976)), a statute that amended the WDA in such a way as to make it sex-neutral. In particular, section 21 of the ASDLA changed language that read:

> ... if the person injured is a married woman, entitle her husband, either separately or by joining with the wife ...

to read instead:

> ... if the person injured is married, entitle the spouse, either separately or by joining with the injured person ...

*See id.* § 21. Ms. Joy observes that, in recommending passage of this law, the Committee on the Judiciary and Criminal Law of the D.C. Council explained its purpose in the following terms:

> Section 21 amends D.C.Code § 16–2701. D.C.Code § 16–2701, which provides a remedy for wrongful death, makes reference to a husband's right to recover for

loss of consortium when his wife is injured by referring to a situation which would "if the person is a married woman, entitle her husband, either separately or by joining with the wife, to maintain an action and recover damages". The language is changed by deleting references to "woman" and "husband" and substituting the word "spouse" where necessary, since women are also entitled to recover for loss of their husband's consortium. See *Hitaffer v. Argonne Co.*, 87 U.S.App.D.C. 57, 183 F.2d 811, 23 A.L.R.2d 1366 (1950).

Council of the District of Columbia Report of May 20, 1976 on Bill No. 1–36, the "Anti-Sex Discriminatory Language Act," at 15. Ms. Joy argues that this passage indicates that "the City Council specifically intended that *both* widows and widowers be able to recover for loss of consortium resulting from the death of their spouses." Brief for Appellee Joy at 3 (emphasis in original). At oral argument, counsel for Ms. Joy embellished this argument by claiming that even if the D.C. Council were operating under the mistaken impression that husbands had a cause of action for loss of consortium under the pre–1976 WDA, the legislative history evinces an intent to add a cause of action for wives.

This argument is more resourceful than persuasive. It is abundantly clear that the overriding purpose of the ASDLA was not to change the substantive rights provided by D.C. law, but merely to make them equally available to men and women. A solitary fragment of legislative history, particularly one that appears to rest on a flawed understanding of preexisting law, simply does not provide a basis for adopting a contrary interpretation. Moreover, Ms. Joy's apparent alternative argument—that the ASDLA added a cause of action for loss of consortium for wives even if no such cause of action exists for husbands—would twist the purpose of the ASDLA beyond all recognition. Instead of ensuring equality of rights between the sexes, it would become a vehicle for institutionalizing inequality.

Ms. Joy's next argument relies on the decision of the D.C. Superior Court in *Bonan v. Washington Hosp. Ctr.*, 119 Daily Wash.

L.Rep. 1685 (D.C.Sup.Ct.1991). In particular, Ms. Joy points to the following comment:

> The [plaintiff's] allegation claimed loss of consortium as an element of plaintiff's wrongful death damages, and properly so, because under District of Columbia law there is no common law right of action for loss of consortium in a death case.... As noted by the United States Court of Appeals for the District of Columbia Circuit ... the Wrongful Death Act provides the sole right of action for loss of consortium in a death case.

*Id.* at 1692 (emphasis added). As support for this statement, the *Bonan* court relied on this court's decision in *Brown v. Curtin & Johnson, Inc.*, 221 F.2d 106, 107 (D.C.Cir. 1955). *See Bonan*, 119 Daily Wash.L.Rep. at 1692.

It is true that we have, on occasion, looked to decisions of the Superior Court for "authoritative guidance" on matters of D.C. law. *Norwood v. Marrocco*, 780 F.2d 110, 112 (D.C.Cir.1986). In the present case, however, we decline to assign any weight to *Bonan* in interpreting the WDA. Significantly, the passage in *Bonan* to which Ms. Joy refers is pure dictum. The actual holding of *Bonan* has to do with the extent of damages recoverable in an action under the Survival Act, D.C.Code Ann. § 12–101. *See Bonan*, 119 Daily Wash.L.Rep. at 1692. In addition, to the extent that *Bonan* does suggest that loss of consortium damages are recoverable under the WDA, the court misread the principal precedent on which it relied. *Cf. Norwood*, 780 F.2d at 113 (emphasizing that deference to the Superior Court's interpretation was appropriate because its decision represented "a well-reasoned, carefully researched opinion on local law"). Specifically, the case cited by the court, *Brown v. Curtin & Johnson, Inc.*, does not hold that loss of consortium damages are available in a wrongful death case. It merely holds that there is no common law right of action for loss of consortium in such a case, so that if loss of consortium damages are recoverable at all, it must be under the WDA. *See Brown*, 221 F.2d at 107. Moreover, it is worth noting that *Brown* cites *Ciarrocchi* with approval. *See id.*

Ms. Joy's final line of attack is to note that there has been a decided trend in the law toward allowing recovery for loss of consortium in death cases, even in jurisdictions with wrongful death statutes that limit recovery to purely "pecuniary losses." The Supreme Court noted this trend in *Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 587–88 & n. 21, 94 S.Ct. 806, 816–17 & n. 21, 39 L.Ed.2d 9 (1974), and accordingly held that damages for "loss of society" are recoverable in maritime wrongful death cases. *See id.* While it is possible that the D.C. Court of Appeals may one day embrace this trend,

> [a] federal court in a diversity case is not free to engraft onto ... state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits.

*Tidler*, 851 F.2d at 424 (quoting *Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975)). At the current time, we see no "authoritative signal," *see id.* (quoting *Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 694 (1st Cir.1984)), indicating that the D.C. Court of Appeals would be in any way receptive to the idea of awarding loss of consortium damages under the WDA. Accordingly, we must conclude that such damages are not available.

### 2. The Expert Testimony

 Rule 702 of the Federal Rules of Evidence provides that

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. A district court has broad discretion regarding the admission or exclusion of expert testimony, and reversal of a decision on these matters is appropriate only when that discretion has been abused. *See United States v. Hall*, 969 F.2d 1102, 1109–10 (D.C.Cir.1992). Moreover, admission of such testimony does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak. *See Bur-*

*lington Northern, Inc. v. Boxberger,* 529 F.2d 284, 286–87 (9th Cir.1975) (indicating that admission of expert testimony constitutes an abuse of discretion only when that testimony qualifies as "rampant speculation"). Notwithstanding the breadth of its discretion, we find that the district court erred by allowing Ms. Joy to introduce Dr. Glennie's testimony.

For sixteen years prior to his death, Mr. Joy and his wife owned and operated the Red Balloon Toy Store. The Joys' 1986 income tax return indicated that Mr. Joy made $14,-680 (i.e., one-half of the Joys' combined income of $29,361). At the trial, Dr. Glennie presented four scenarios under which he provided a range of estimates for the income that Mr. Joy might have earned if he had survived the crash. Under "scenario 4," Mr. Joy was assumed to continue to operate the toy store on a full-time basis, resulting in a 1992 annual income of $35,907, and total lifetime income having a present discounted value in 1990 of $570,908. "Scenario 3" assumed that Mr. Joy would devote half of his time to the toy store and the other half to "consulting and wholesaling" activities. The projected result was a 1992 income of $58,742 and a total income with a present discounted value of $893,670. "Scenario 1" and "scenario 2" assumed that Mr. Joy would have moved into consulting and wholesaling on a full-time basis, with the second scenario assuming greater success than the first. Under scenario 1, Mr. Joy was projected to earn $81,578 in 1992 and a total discounted income of $1,210,467; under scenario 2, Mr. Joy was projected to earn $97,536 in 1992 and a total discounted income of $1,428,165.

Dr. Glennie's bases for concluding that Mr. Joy might move into consulting were (1) his conversations with Ms. Joy and (2) the fact that Mr. Joy had once assisted a woman in Texas in starting a toy store, although he received no compensation for his services except perhaps a discount on a car. Dr. Glennie's conclusion that Mr. Joy would move into wholesaling was premised on the fact that Mr. Joy had on occasion received discounts for pooling his inventory purchases with other toy stores.

Dr. Glennie also testified that over Mr. Joy's lifetime, the value of his real estate investments would have increased to $4,823,-438, with a present discounted value of $1,218,988. Although Dr. Glennie characterized this estimate in broad terms as encompassing all possible real estate ventures that Mr. Joy might have pursued, the estimate was in fact based on his projections for the increase in value of a single piece of unimproved land in the Virgin Islands that Mr. Joy had purchased for $60,000. Dr. Glennie's analysis proceeded in two steps. First, Dr. Glennie assumed that a house worth $170,000 would be built on the property based on the fact that Mr. Joy had recently acquired a building permit. Second, Dr. Glennie estimated that this new house would appreciate at 11 percent a year for the remainder of Mr. Joy's life. The 11 percent figure was based on Dr. Glennie's estimate of the "net value" of the appreciation, over and above the rate of appreciation of other housing in the area, of a house Mr. Joy had owned and recently sold in the District of Columbia, along with a factor for inflation. Dr. Glennie attributed the greater appreciation of Mr. Joy's Washington house to the improvements he had personally made on it, and assumed that similar improvements would result in a like appreciation of the value of the yet-to-be-built house in the Virgin Islands.

Allison argues that the district court should have excluded Dr. Glennie's testimony because it "was based solely on guesswork, speculation, and conjecture." Brief for Appellant at 45. We agree with this assessment. Indeed, as Allison suggests, this case is similar in many respects to *In re Air Crash Disaster at New Orleans,* 795 F.2d 1230, 1233 (5th Cir.1986), a case that this court cited with approval in *Coleman v. Parkline Corp.,* 844 F.2d 863, 867 n. 3 (D.C.Cir.1988). In *Air Crash,* a district court allowed the plaintiffs to introduce expert testimony concerning the income that their father would have earned if he had not died in the 1982 crash of a Pan American airplane. *See* 795 F.2d at 1231, 1234–35. The decedent was a "key figure" in the management of a group of marine companies that filed for bankruptcy shortly after his death. *See id.* at 1232. The Fifth Circuit held that the testimony was so fundamentally flawed

that the district court had abused its discretion by failing to exclude it. The court observed, *inter alia*, that (1) the expert's assumption that the decedent would have received an 8 percent salary increase each year for forty years was "unsupported by the record and completely incredible"; (2) the expert's assumption that the decedent would maintain an effective tax rate of 5 percent throughout his career was "[e]ven more incredible"; (3) the expert "failed to consider ... the limits on future expansion" of the decedent's companies, the "cyclical nature" of the marine industry, "or the future personal choices [the decedent] might make to avoid work-related health or stress problems later in his career"; and (4) the expert "inappropriate[ly]" assumed that the decedent would begin saving at a rate of up to 20 percent a year, despite the fact that he had virtually no savings at the time of his death. *See id.* at 1234–35.

As in *Air Crash*, there is little, if any, basis in the record for Dr. Glennie's estimates of Mr. Joy's future earning capacity. Most prominently, the assumption that Mr. Joy would move into consulting and wholesaling appears to be wholly speculative. Indeed, Dr. Glennie simply made up new lines of work for Mr. Joy. With respect to consulting, one lone instance in which Mr. Joy helped a person set up a toy store in Texas and received no monetary compensation can hardly provide a foundation for serious estimates of Mr. Joy's future earnings as a consultant. This is especially so in light of the fact that Dr. Glennie made no effort to contact the Texas store owner to determine how helpful Mr. Joy's assistance had been. Similarly, there is no evidence that Mr. Joy ever received independent compensation for his alleged wholesaling activities.

Ms. Joy resists this conclusion by pointing to her own testimony that she had discussed with her husband the possibility of his expanding into consulting. She adds that the evidence at trial "clearly established that Robert Joy was a talented and creative person...." Brief for Appellee Joy at 11. It should be obvious that these facts, which Allison does not dispute, are not sufficient to lift Dr. Glennie's projections out of the realm of pure conjecture.

Dr. Glennie's estimate of the future value of Mr. Joy's real estate investments is also highly speculative. For example, Dr. Glennie based his projections on a single piece of property in the Virgin Islands without ascertaining the experience of investors in the Virgin Islands housing market. If, however, property values were declining in that market, it is possible that any "net value" that Mr. Joy might have added would be dwarfed by the general decline.

Perhaps recognizing the weakness of her position, Ms. Joy falls back on the claim that Allison was able to cross-examine Dr. Glennie and present its own economic expert to highlight the flaws in Dr. Glennie's analysis, thereby enabling the jury "to weigh the testimony of both experts and reach its own conclusion." *Id.* at 12. She might have added that this case is distinguishable from *Air Crash* in at least one respect: Dr. Glennie presented one estimate of Mr. Joy's lifetime earnings (scenario 4) that could be considered "non-speculative" in addition to the three other estimates for which there was no adequate foundation. Presumably, the existence of a non-speculative estimate would have increased the jury's ability to arrive at an appropriate damages award.

Nevertheless, in view of the patent flaws in Dr. Glennie's testimony, we must resist "the temptation to answer objections to receipt of expert testimony with the shorthand remark that the jury will give it 'the weight it deserves.'" *Air Crash*, 795 F.2d at 1233. Indeed, we have already indicated that we will turn a "sharp eye" to "those instances, hopefully few, where ... the decision to receive expert testimony was simply tossed off to the jury under a 'let it all in' philosophy." *Coleman*, 844 F.2d at 867 n. 3 (quoting *Air Crash*, 795 F.2d at 1234). This appears to be precisely such a case.

In closing, we note that our conclusion with respect to Dr. Glennie's testimony is unaffected by the Supreme Court's recent decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Although the Court in *Daubert* recognized that the Federal Rules

of Evidence embody a "general approach of relaxing traditional barriers to 'opinion' testimony," *see id.* —— U.S. at ——, 113 S.Ct. at 2790 (quoting *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 S.Ct. 439, 450, 102 L.Ed.2d 445 (1988)), it also emphasized that Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify," *id.,* —— U.S. at ——, 113 S.Ct. at 2795. In particular, the Court observed that Rule 702 permits an expert to testify only when "scientific, technical, or other specialized *knowledge* will assist the trier of fact," *id.* (quoting Fed.R.Evid. 702) (some emphasis deleted), and that "the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* As discussed above, Dr. Glennie's testimony concerning Mr. Joy's future career path fails to meet this standard.

### III. Conclusion

We affirm the judgments that (1) Allison is liable to plaintiffs, and (2) Mr. Turley is not liable to Allison for contribution because he was not negligent in piloting the helicopter. We reverse and remand, however, the damages award to Ms. Joy. Finally, we will certify to the D.C. Court of Appeals the question whether the District is rendered immune from liability under the public duty doctrine when its officers interfere with civilian rescue efforts, thereby worsening the condition of accident victims.

*So ordered.*